**P. H. WELDER and Katie Welder**

v.

**UNITED STATES of America.**

Civ. A. No. 68–V–5.

United States District Court,
S. D. Texas,
Victoria Division.

July 23, 1971.

Robert K. Sands, and O. Jan Tyler, Sands, Tyler & Trimble, Dallas, Tex., Guittard, Henderson, Jones & Lewis, Victoria, Tex., for plaintiffs.

Anthony J. P. Farris, U. S. Atty., Houston, Tex., Johnnie M. Walters, Asst. Atty. Gen., Arthur L. Biggins and Myron C. Baum, Dept. of Justice, Tax Div. Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

BUE, District Judge.

Plaintiffs, P. H. Welder and Katie Welder, are husband and wife and, since 1957, have resided on their Green Lake Ranch in Calhoun County, Texas. They are cash basis taxpayers. Joint federal income tax returns for each of the years 1958 through 1964 were timely filed by the taxpayers, and any tax shown to be due was timely paid each year. In 1965, a government audit of the taxpayers' joint return for each of the years 1958 through 1964 was made, resulting in a determination by the Commissioner of Internal Revenue that tax deficiencies existed in the total sum of $1,219,741.14. Taxpayers promptly paid these deficiencies in tax and interest, and filed claims for refund. The disallowance of these claims necessitated the institution of this suit.[1]

During the years involved, taxpayers owned and operated three ranches. The Green Lake Ranch, located in Calhoun and Victoria Counties, Texas, covering approximately 17,700 acres, was used primarily for the grazing and pasturing of taxpayers' breeding herd of Hereford cattle and for processing the calves produced by the herd. Feed crops were grown and processed on the Green Lake Ranch. The Sinton Ranch located in San Patricio County, Texas, was similarly used by taxpayers for grazing, pasturing and developing their breeding herd. They also used their 36,000 acre Cameron Ranch, located in LaSalle and McMillan Counties for their cattle raising operations, there pasturing and feeding steer calves for ultimate sale.[2] Calves produced by the breeding herd, after weaning, were moved to the Green Lake Ranch for processing. Heifer calves were retained there for development to maturity and inclusion in the breeding herd. Steer calves were sold, and all bulls used for breeding purposes were acquired by purchase.

In addition to their cattle raising operations, taxpayers also received income from oil and gas royalties received from producing oil wells located on the Green Lake and Sinton Ranches. They consider their oil operations and ranching operations to be a single unified business, and have so treated all activities in their bookkeeping practices.[3] The issues raised by this treatment and other disputed questions were deferred by the Court, since consideration and determi-

---

1. These deficiencies in income tax, plus interest were paid by taxpayers on February 6, 1967, as follows:

| YEAR | DEFICIENCY | INTEREST | TOTAL |
|---|---|---|---|
| 1958 | $ 25,520.73 | $ 11,852.80 | $ 37,373.53 |
| 1959 | 59,748.46 | 24,852.80 | 83,913.03 |
| 1960 | 74,168.39 | 25,546.43 | 99,714.82 |
| 1961 | 117,554.58 | 33,437.03 | 150,991.61 |
| 1962 | 200,772.67 | 45,061.09 | 245,833.76 |
| 1963 | 280,237.73 | 46,081.83 | 326,319.56 |
| 1964 | 249,533.92 | 26,060.91 | 275,594.83 |
| Total | $1,007,536.48 | $ 212,204.66 | $1,219,741.14 |

On July 5, 1967, taxpayers filed claims for refund for the amounts described plus interest, which claims were disallowed on January 19, 1968. Stipulations 2 and 3.

2. In 1963, taxpayers purchased the 56,000 acre Welder-Dobie Ranch, located in LaSalle and Webb Counties. This ranch was under lease during 1963 and 1964, and no part of taxpayers' ranching operations was conducted thereon.

3. When the oil operations and cattle operations are considered as one trade or business, the deficiency computations as made by the Commissioner are inapplicable, and taxpayers would be entitled to a refund. This issue, however, is not now before the Court and need not be considered.

nation of one issue at this time might obviate the need to decide the remainder. This one issue, if decided in the taxpayers' favor, is determinative of the outcome of this suit. Thus, the single issue now before the Court is whether all or any part of taxpayers' ranch expenses constitute "specially treated deductions" under § 270(b) of the Internal Revenue Code of 1954.

In order to follow the respective legal theories of able counsel in this highly complex and frequently confusing area of the tax law, the Internal Revenue Code which is the law and the Regulations which constitute the Commissioner's interpretation of the tax law must be examined side by side. It may be of assistance at this point before commencing a detailed analysis of the various provisions of the Code, Regulations and supporting authorities to be alerted to the purpose, sequence and manner in which these provisions are urged upon the Court by the parties.

Section 270(a) of the Code is important in this case because it pertains to the limitations on permitted deductions to certain taxpayers for business purposes; § 270(b) is critical because it is an exception to the general rule limiting deductions attributable to such businesses. Plaintiffs, as taxpayers in the cattle ranching business, want the benefit of the exception in the Code, and the government as defendant denies its applicability. Going one step further, the taxpayers cite language in §§ 1.162–12 and 1.471–6 which they contend gives them the option to deduct certain expenses of raising livestock, when incurred, or to defer or capitalize them. The option provided under either of these sections, it is contended, would allow the taxpayers to claim these expenditures as specially treated deductions under the language of § 270(b) of the Code.

But there is more involved than the bare provisions of the Code and these Regulations. It is contended that there are and have been semantical difficulties in construing the Code and Regulations, particularly in the accounting field with reference to what constitutes capital expenditures in the cattle raising business. It is urged that generally accepted accounting principles as opposed to tax accounting concepts lead to different results, and the government contends that certain reported case law, specifically Sonnabend v. Commissioner of Internal Revenue, 377 F.2d 42 (1st Cir. 1967), has gone awry through a failure to recognize this distinction in considering the tax treatment to be afforded deductions under the Code. Taxpayers deny the accounting distinction and assert that the costs of raising livestock are clearly capital expenditures and that the admitted paucity of case authority on the point nevertheless supports their position.

This inquiry inevitably leads to a detailed examination of the legislative history of the Code in order to ascertain the precise intent of Congress, particularly in view of the government's position that to accede to the taxpayers' interpretation of the tax law is to render § 270(b) meaningless and, indeed, to place such section of the Code at serious odds with other tax provisions. This legislative history which was not amplified to the same extent at the trial as in the post-trial legal memoranda submitted to the Court does serve to cast beneficial light on this intricate combination of tax rules comprised of codal provisions, regulations and interpretations which Judge Learned Hand so aptly characterized years ago in the following terms:

In my own case the words of such an act as the Income Tax, for example, merely dance before my eyes in a meaningless procession: cross-reference to cross-reference, exception upon exception—couched in abstract terms that offer no handle to seize hold of —leave my mind only a confused sense of some vitally important, but successfully concealed, purport, which it is my duty to extract, but which is within my power, if at all, only after the most inordinate expenditure of time. I know that these monsters are the result of fabulous industry and ingenuity, plugging up this hole and

casting out that net, against all possible evasion; yet at times I cannot help recalling a saying of William James about certain passages of Hegel: that they were no doubt written with a passion of rationality; but that one cannot help wondering whether to the reader they have any significance save that the words are strung together with syntactical correctness. Much of the law is now as difficult to fathom, and more and more of it is likely to be so; for there is little doubt that we are entering a period of increasingly detailed regulation, and it will be the duty of judges to thread the path—for path there is —through these fantastic labyrinths.

\* \* \*

Hand, Eulogy of Thomas Walter Swan, 57 Yale L.J. 167, 169 (1947).

## I.

## § 270(a) OF THE INTERNAL REVENUE CODE PERTAINING TO DEDUCTIONS ALLOWED TO INDIVIDUAL TAXPAYERS ENGAGED IN A TRADE OR BUSINESS

Section 270(a) of the 1954 Code provides:

> If the deductions allowed by this chapter \* \* \* (other than specially treated deductions, as defined in subsection (b)) allowable to an individual \* \* \* and attributable to a trade or business carried on by him for 5 consecutive taxable years have, in each of such years \* \* \* exceeded by more than $50,000 the gross income derived from such trade or business \* \* \* such deductions shall be allowed only to the extent of $50,000 plus the gross income attributable to such trade or business \* \* \*. (emphasis added)

The Section establishes special limitations on deductions by individuals where, in each of five consecutive years, the deductions attributable to the individuals' trade or business exceed the gross income from such trade or business by more than $50,000.[4] In determining whether the limitation of gross income, plus $100,000 is exceeded by the deductions for the years concerned, certain deductions, known as "specially treated deductions" are ignored.[5] In other words, the statute provides for the out-calculation of certain items such as taxes, interest, casualty and abandonment losses, drought expense, and "expenditures as to which taxpayers are given the option, under law or regulations, either (1) to deduct as expenses when incurred or (2) to defer or capitalize."[6] Once these calculations have been made, if the deductions attributable to a trade or business exceed gross income from such business by more than $50,000, or $100,000 in community property states, then the taxable income of the individuals is required to be recomputed for each of such five consecutive years.

After examining the taxpayers' income tax returns for the years involved here (1958–1964), the Commissioner of Internal Revenue determined that the total amounts of business deductions claimed by them for *each* of these years were subject to the ceiling. Taxpayers must therefore show that for at least one of these years, the claimed deductions did not exceed the ceiling prescribed by § 270 of the Code. If taxpayers can break one year in the chain of consecutive years, no tax will be due for any of the years, because the statute does not apply and recomputation is not required, unless this ceiling is exceeded in each of five consecutive tax years.

---

4. When joint returns are filed in community property states such as Texas, each spouse is treated as a separate taxpayer, and the dollar limitation prescribed ($50,-000) is allowed to each spouse. Revenue Ruling 54-179, 1954-1 Cum.Bull. 129. Since joint returns were filed in a community property state (Texas), the dollar limitation prescribed by § 270(a) is $100,-000 in this case.

5. Int.Rev.Code of 1954, 26 U.S.C. § 270 (b) (1964).

6. *Id.*

Taxpayers challenge the validity of the Commissioner's determination, contending that the Commissioner erroneously ruled that their direct and indirect ranch expenses for the year 1960 did not qualify as "specially treated deductions". If taxpayers correctly contend that these expenses qualify as specially treated deductions, then claimed deductions for 1960 did not exceed the ceiling prescribed by § 270, and taxpayers are entitled to their refund.

For the year 1960, the Commissioner computed taxpayers' unallowable loss under § 270 of the Internal Revenue Code as follows:

| | | |
|---|---|---|
| Total Direct Expense: | $267,427.40 | |
| Depreciation | 70,117.41 | |
| Overhead | | |
| 218,375.02 x 4310 | 94,119.63 | |
| Total Expense: | | $431,664.44 |
| Adjustments: | | |
| Gross Income | $110,937.21 | |
| Casualty Loss | 15,300.16 | |
| Social Security Tax | 1,666.12 | |
| 4310 x 701.25 | 302.24 | |
| Other taxes | 30,439.25 | |
| Statutory Allowance | 100,000.00 | (258,644.98) |
| Unallowable Loss From Ranching: | | $173,019.46 |

Taxpayers contend that all of their direct[7] and indirect[8] ranch expenses should have been included in this computation as "specially treated deductions." Alternatively, they contend that at least $173,019.46, or approximately 40 percent of the total expenses for the year 1960 would qualify. If either one of these contentions is valid, § 270 is inapplicable to any of the years in issue, and taxpayers are entitled to judgment.

II.

§ 270(b) THE EXCEPTION TO THE GENERAL RULE ON DEDUCTIONS WHICH APPLIES WHEN THEY CAN BE CHARACTERIZED AS "SPECIALLY TREATED DEDUCTIONS"

Subsection (b) of § 270 defines "specially treated deductions" to include:

expenditures as to which taxpayers are given the option, under law or regulations, either (1) to deduct as expenses when incurred or (2) to defer or capitalize.

Taxpayers contend that they are given the option to expense or capitalize the cost of raising livestock under Treasury Regulations § 1.162–12 or § 1.471–6, either of which is sufficient to afford the optional treatment required in § 270(b).

Section 1.162–12 provides that "[t]he purchase of feed and other costs connected with raising livestock *may be treated* as expense deductions insofar as such costs represent actual outlay. * * *" This Section applies to all farmers, regardless of whether they use the cash or accrual method of accounting. Taxpayers contend that the language is clearly permissive, giving farmers the option of deducting as current

---

7. The government determined taxpayer's direct ranch expenses for the year 1960 to be as follows:

| | |
|---|---|
| Utilities | $ 9,973.95 |
| Feed & Seed | 26,519.88 |
| Groceries | 11,171.25 |
| Supplies & Mtnce. | 80,158.76 |
| Veterinary | 2,742.12 |
| Ranch Medical | 882.33 |
| Misc. Ranch Expense | 1,095.07 |
| Gas, Oil and Repairs | 21,085.10 |
| Rose Hedge Expense | 13,101.40 |
| Hauling | 3,692.55 |
| Pasture Rent | 1,066.66 |
| Death Losses | 15,300.16 |

| | | |
|---|---|---|
| Salaries & Wages | 54,881.95 | |
| Social Security Tax | 1,666.12 | |
| Taxes | 30,439.25 | |
| Insurance | 5,650.85 | |
| Personal Expense | | |
| Adjustment | (12,000.00) | |
| Total: | | $267,427.40 |
| Less Items Allowed Above: | | |
| Death Losses | $15,300.16 | |
| Social Security Tax | 1,666.12 | |
| Taxes | 30,439.25 | |
| Total: | | $ 47,405.53 |
| Total: | | $220,021.87 |

---

8. Indirect ranch expenses are comprised of depreciation in the amount of $70,117.41, and allocated overhead in the amount of $94,119.63. *See* plaintiffs' brief in support of motion for summary judgment at 8.

expenses items which normally must be capitalized or deferred. In Sonnabend v. Commissioner of Internal Revenue, 377 F.2d 42 (1st Cir. 1967), the Court of Appeals for the First Circuit held that since § 1.162–12 permitted the taxpayer to treat the purchase of feed and other costs connected with raising livestock as expense deductions instead of capitalizing them, these expenses qualified as "specially treated deductions" and were to be disregarded for purposes of the $100,000 limitation on deductions of losses for five consecutive years. In that case, the Court stated:

> The first issue seems to us very simple. Cattle raised for breeding are capital assets. Consequently, as the government concedes, the cost of their feed can be capitalized. *Cf.* United States v. Catto, 1966, 384 U.S. 102, 86 S.Ct. 1311, 16 L.Ed.2d 398. A regulation provides, however, '* * * the purchase of feed and other costs connected with raising livestock may be treated as expense deductions * * *.' 26 C.F.R. § 1.162–12. As a result of this option to expense, rather than capitalize, the cost of feed, this cost precisely meets the statutory definition of a "specially treated deduction."

Sonnabend v. Commissioner of Internal Revenue, 377 F.2d 42, 43 (1st Cir. 1967). Thus, although taxpayers in the instant case use a cash receipts and disbursements method of accounting, they contend that they had the option or election to expense or capitalize all costs of raising livestock under § 1.162–12. Without this special option, taxpayers state the general rule would require farmers and ranchers to defer or capitalize all costs

incurred in purchasing and developing capital assets and inventory. They contend that all of the direct ranch expenses and allocated overhead, as set out in footnotes 7 and 8, are items which enter into the computation of costs of goods, items which normally taxpayers are not permitted to deduct as a current expense. To that effect, they cite United States v. Catto, 384 U.S. 102, 86 S.Ct. 1311, 16 L.Ed.2d 398 (1966):

> The general and long-standing rule for all taxpayers, whether they use the cash or accrual method of accounting, is that costs incurred in the acquisition, production, or development of capital assets, inventory, and other property used in the trade or business may not be currently deducted, but must be deferred until the year of sale, when the accumulated costs may be set off against the proceeds of the sale. Under general principles of accounting, therefore, it would be expected that expenses incurred by ranchers in raising breeding livestock should be charged to capital account, even though the ranchers employed the cash method of accounting.[9]

The Supreme Court further stated:

> The applicable Treasury Regulations grant a current deduction for the expenses incurred in raising livestock, without regard either for the purpose for which the animals are raised or for the method of accounting employed by the taxpayer.[10]

Taxpayers take this language to mean that, although using the cash method, they could have elected to capitalize the costs of all cattle raised on the farms as well as cattle purchased. If costs had been so capitalized, the cattle born on

---

9. United States v. Catto, 384 U.S. 102, 109–110, 86 S.Ct. 1311, 1315 (1966).

10. *Id.* at 106, 86 S.Ct. at 1313 (footnote omitted). *See also* United States v. Wardlaw, 344 F.2d 225 (5th Cir. 1965), rev'd on other grounds sub nom., United States v. Catto, 384 U.S. 102, 86 S.Ct. 1311, 16 L.Ed.2d 398 (1966);

> One complicating factor is the practice, recognized by formal regulation, by

which both accrual and cash basis taxpayers may deduct the cost of feeding, raising and maintaining animals as ordinary and necessary business expense rather than treating them as capital expenditures for the 'acquisition' of a capital asset, i. e., a mature animal. * * *

*Id.* at 226–227.

the farm would have had a basis for determining gain or loss, subject to depreciation equal to the costs of production. Costs of raising purchased cattle to maturity would be added to the purchase price.[11]

The government argues, however, that cash basis cattlemen cannot capitalize the cost of any raised livestock or the cost of any livestock purchased for the purpose of resale. Second, both cash and accrual basis cattlemen must capitalize the costs of stock purchased for breeding purposes. The rule is viewed as inflexible. No alternative accounting treatment is permitted for either class of livestock.

Thus the correct interpretation of § 270(b) as applied to this case turns on whether costs connected with raising livestock can be viewed as capital expenditures as taxpayers urge, or whether such costs constitute ordinary expenses as the government contends. If the Court finds that such costs are capital in nature, a holding for the taxpayers is required.

### III.

#### THE GOVERNMENT'S CONTENTIONS THAT APPLICABLE TAX ACCOUNTING PRINCIPLES COMPEL THE CONCLUSION THAT COSTS OF RAISING LIVESTOCK ARE NOT CAPITAL EXPENDITURES

It is urged by the government that the treatment afforded to any particular item is not always the same under generally accepted accounting principles as opposed to tax accounting concepts. Commercial accounting and tax accounting theories simply do not always reach the same result.[12] Thus, as pointed out by counsel for the government, a capital asset within the accountant's concept

may not be a capital asset as treated under the Internal Revenue Code. Specifically, the government asserts that while income from the sale of breeding stock is treated as capital gain for tax purposes, cattle which are purchased or raised for breeding purposes are not capital assets under the Code.[13]

The government urges that an acceptable definition for capital asset under generally accepted accounting concepts is one which is "purchased for use in production over relatively long periods of time rather than for resale or for conversion in a single operation." The term is often used synonymously with "fixed asset" and is exemplified by such items as land or buildings and equipment.[14]

On the other hand, the statutory or tax accounting concept of capital assets is asserted to be different. Section 1221 of the Internal Revenue Code defines the term as follows:

> For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business
>
> \*　\*　\*.

The statutory definition, then, excludes from consideration as a capital asset "inventory, stock in trade, property used in the taxpayers' trade or business and a copyright or artistic production owned by the creator of the works."[15]

This distinction, the government states, is crucial in weighing the language of the Supreme Court in *Catto*, that under general principles of account-

---

11. *See* Plaintiff's brief in support of motion for summary judgment at 15.

12. Freedman v. United States, 266 F.2d 291 (6th Cir. 1969); Guardian Investment Corp. v. Phinney, 253 F.2d 326, 329 (5th Cir. 1968); 2 Mertens, Law of Federal Income Taxation § 12.01 at 6 (1967 ed).

13. Defendant's trial brief at 14.

14. Kohler, A Dictionary for Accountants 82 (3d ed. 1952).

15. *Id.*

ing "expenses incurred by ranchers in raising breeding livestock should be charged to capital account, even though the ranchers employed the cash method of accounting," [16] and in understanding that this excerpt from *Catto* does not define the applicable tax treatment of these expenses. In fact, it is urged, the Court in that case went on to specify the only correct tax treatment of such expenses for cash method ranchers:

The applicable Treasury Regulations grant a current deduction for the expenses incurred in raising livestock, without regard either for the purpose for which the animals are raised or for the method of accounting employed by the taxpayer. For ranchers who have elected the cash method of accounting, the current deduction is *of course* taken against ordinary income in the year the expense is paid.[17] (emphasis added)

Premised upon the assertions that the only tax treatment allowed for cash basis taxpayers as to costs of raising livestock are current deductions, the argument is advanced by the government that § 1.162–12 of the Regulations does not offer an option to the rancher employing the cash basis method of accounting. Pursuant to this Regulation, therefore, both cash and accrual basis farmers and ranchers may currently deduct costs of feed and other costs connected with raising livestock. A review of the legislative history of the tax law and regulations, however, points up the different rationales utilized for according the same treatment to both. Cash basis ranchers currently deduct the cost of raising livestock because, historically and currently under the law and Regulations, they have been provided with no alternatives. Accrual basis ranchers

necessarily, due to the mechanics of the operation of certain accrual methods of accounting, take current deductions for the expenses of raising livestock. These deductions, however, are offset by the annual increments in closing inventory values. The effect of this simultaneous addition of annual increments in inventory and subtraction of annual costs is a deferral of the expenses of raising livestock until the year of sale.[18]

## IV.

## THE TAXPAYERS' CONTENTIONS SUPPORTING THE THESIS THAT SUCH COSTS OF RAISING LIVESTOCK ARE CAPITAL EXPENDITURES TO THE TAXPAYERS

Taxpayers urge that language in the *Catto* opinion, construed by the government as requiring a current deduction for cash basis farmers, 384 U.S. at 106, 86 S.Ct. at 1313,[19] does not state a rule or requirement, but merely a *result* of taking a current deduction. In other words, the Court states that the *result* of taking a current deduction by a cash basis taxpayer is a deduction against ordinary income in the year the expense is paid and an adjusted basis of zero on the animal at the time of sale. Likewise, the Court goes on to say that the result of taking a current deduction by an accrual method taxpayer, in effect, amounts to a deferral of that expense, since their current deductions are offset by the annual increments in the unit inventory value of animals not sold during a taxable year. Such a reading acquires feasibility, especially in the light of the Court's interpretation of the legislative history surrounding the applicable sections of the Code. *See* 384 U.S. at 110–111 and n. 13, 86 S.Ct. 1311.[20]

---

16. United States v. Catto, 384 U.S. 102, 110, 86 S.Ct. 1311, 1315 (1966).

17. *Id.* at 106, 86 S.Ct. at 1313–1314, citing to § 1.162–12 of the Regulations. The Supreme Court goes on to discuss the rationale for granting a current deduction for livestock expenses to accrual basis taxpayer.

18. *Id.* at 107.

19. *See* text accompanying n. 17, *supra.*

20. The government takes exception to the Supreme Court's statement of that history. *See* defendant's trial brief at 16–18.

Further supportive language for this interpretation comes from the Fifth Circuit Court of Appeals in United States v. Wardlaw, 344 F.2d 225, 226 n. 3 (5th Cir. 1965), rev'd on other grounds sub nom., United States v. Catto, 384 U.S. 102, 86 S.Ct. 1311, 16 L.Ed.2d 398 (1966). There, the Court found that:

One complicating factor is the practice, recognized by formal regulations by which both accrual and cash basis taxpayers may deduct the cost of feeding, raising and maintaining animals as ordinary and necessary business expense rather than treating them as capital expenditure for the 'acquisition' of a capital asset, i. e., a mature animal. Treasury Regulation 1.162–12.

Further, in United States v. Catto, 344 F.2d 227, 229 (5th Cir. 1965), a companion case also overruled by the Supreme Court on other grounds, the Court's language implied that the current deduction of such expenses was a concession by the Commissioner in contravention to the general rule:

The taxpayers, on the other hand, note the discriminatory effect of this requirement on accrual taxpayers, since the Treasury has long *indulged* similar cash basis taxpayers by allowing them to write off the raising costs of breeding cattle against ordinary income and compute their capital gain on the sale of such cattle on a zero basis. (emphasis added)

*See also* the earlier decision of the Fifth Circuit in Scofield v. Lewis, 251 F.2d 128, 132 (5th Cir. 1958) which, although questioned by the Supreme Court in *Catto* as to their ruling on a section of the Code not now before us, is still good authority for the proposition that "[a]nimals in a breeding herd are capital assets * * *." Moreover, the government's own brief to the Supreme Court in *Catto* is supportive:

In the early 1920s the Commissioner recognized that many farmers and ranchers were not capable of valuing cattle on hand and deferring costs properly allocable to them. Therefore, in order to afford them an extremely simple method of accounting, the Commissioner relaxed the general rule requiring all taxpayers to accumulate the costs of constructing or creating assets. Pursuant to his authority to promulgate and define methods of accounting, he permitted farmers and ranchers who elected the *cash* method to deduct the costs of raising crops or livestock as incurred. However, it is quite clear that as to those farmers and ranchers who elected the *accrual* method of accounting, the Regulations did not deviate from the general rule requiring all taxpayers to defer the cost of constructing or creating either inventory or capital assets.

*See* Plaintiffs' Post-Trial Original Brief at 32.

A 1966 decision by the Tax Court recognizes that a taxpayer is given the option to expense or capitalize the cost of raising livestock. In Kittitas Ranch, Inc., ¶67,141 P–H Memo T.C., the Tax Court stated:

Although generally taxpayers, even though they report their income on a cash basis, are required to capitalize the cost of all assets used in their trade or business with a useful life in excess of one year and recover such costs by way of depreciation, there has long been in respondent's regulations *an exception* for farmers. A farmer who reports income on the cash basis *may deduct currently* in computing his yearly income the cost of raising breeding animals on his farm regardless of useful life of such animals and capitalize for recovery through depreciation deduction only the cost of purchased breeding animals. A farmer *who elects* this method has a basis of zero in the breeding animals he has raised since he has recovered his total cost by way of deduction in computing his annual income. *This permits* the deduction from ordinary income for the cost of raising breeding animals instead of a *postponement of the deduction* to be taken in determining a

capital gain or loss when such animal is disposed of. This advantage is given by respondent's regulations to a farmer. (emphasis added)

Several commentators have voiced the rule similarly. It is very clearly set out in Jamison, Tax Planning With Livestock and Farming Operations, 1961 So. Calif. Tax Inst. 583, cited with approval by the Supreme Court in *Catto*:

At the time the Revenue Act of 1942 incorporated this principle into the income tax law, the Treasury Department had for many years permitted farmers to deduct currently on the cash receipts and disbursements basis, the cost of raised livestock, regardless of whether such livestock was held for sale or was used for draft, dairy or breeding purposes. * * * The only exception to the above rules was the rule that required the farmer with respect to purchased livestock to capitalize the purchase cost. Even here it was only the initial purchase cost that was required to be capitalized. The expense of raising and caring for the animal was deducted on the cash basis when paid by the farmer, and if he used inventories, the only requirement was that the effect of the manner in which the item was handled was to capitalize and not currently deduct the purchase price of the animal. There is nothing to prevent the farmer, however, from following the procedure required of other taxpayers by capitalizing all of the costs of any animal whether purchased or raised, thereafter deducting depreciation allowances based on this cost over the remaining useful life of the animal.

*Id.* at 600–01. *See* Appendix E to Plaintiffs' Post-Trial Original Brief.

In the Farm Income Tax Manual §§ 547 and 553 (4th ed.) written by Professor John C. O'Byrne, the guidelines there set out for taxpayers include the following admonition:

Don't claim depreciation on animals *raised*, unless the costs have been capitalized rather than deducted as expenses.

Professor O'Byrne's comments are obviously predicated upon his belief that the rules provide optional treatment of the costs incurred in raising livestock. In § 553 of this treatise, he goes on to say that farmers may not claim depreciation for animals raised unless "the farmer has set aside the actual costs of bringing the animal to a productive stage rather than claiming these expenses as current deductions." He continues, stating that "the average cash-basis farmer", preferring to currently deduct expenses, should claim depreciation only for dairy, breeding and sporting animals which he purchases rather than raises.

In order to weigh intelligently the sharply contrasting arguments advanced by the parties this Court feels obligated to look further for explanations of rulings issued by the Commissioner and to discussions found in the legislative history of the relevant Code sections. In S.Rep. 91–552, 91st Cong., 1st Sess., 1969–3 Cum. Bull. 423, 484, relating to farm losses and limitation of deductions attributable to farming, the Senate Finance Committee stated:

A taxpayer in the business of farming is also allowed to deduct expenditures for developing a business asset which other taxpayers would have to capitalize.

For instance, the expenses of raising a breeding herd of livestock may be currently deducted. The same thing is true of expenditures to develop a fruit orchard. There also are certain other capital expenditures in connection with farming operations which a taxpayer may elect to currently deduct from ordinary income * * *.

The Finance Committee's report goes on to state that other capital expenditures of the same character include soil and water conservation, fertilizer and land clearing expenditures, and other such expenses which the government in this case unqualifiedly assumes to be capital in nature.

The Committee's interpretation of the law coincides exactly with that given it by the Commissioner in I.T. 3666, 1944 Cum. Bull. 270 relating to gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business. The relevant portion of that ruling provides:

> Section 29.22(a)–7 of Regulations 111, relating to the gross income of farmers, provides that a farmer reporting on the cash receipts and disbursements basis shall include in gross income the amount received from the sale of livestock raised, whereas, in the case of livestock purchased, the amount to be included in gross income is the profit determined by reference to cost less any depreciation allowable. That language might be taken to imply that livestock raised is not under any circumstances to be *treated* as property used in the trade or business of a character subject to depreciation. However, properly construed, the regulations merely recognize the practical difficulties encountered by the farmer in segregating his various costs and *permit* him to deduct currently the cost of raising livestock, irrespective of the use to which such livestock is to be put, instead of capitalizing such cost.

> \*   \*   \*   \*   \*   \*

The above-cited provisions of the regulations and the practice thereunder do not serve to alter the inherent character of livestock used for draft, breeding, or dairy purposes as capital assets subject to the allowance for depreciation, irrespective of whether the farmer has adopted the practice of capitalizing such livestock.[21]

The Senate Finance Committee Report went on to say, at 485:

> Thus, the combination of a current deduction against ordinary income for

various farm expenditures which are capital in nature and the capital gains treatment granted on the sale of the asset to which the expenditures relate produce a significant tax advantage and tax savings for the taxpayer whose ordinary income is taxed in a high bracket.

The taxpayers note the reliance placed by the government upon Treas.Dec. 2153, 17 Treas.Dec. Int.Rev. 101 (1915), the general import of which shows that costs of cattle purchased for breeding purposes should be capitalized and depreciated, and costs of stock raised should be currently deducted. Taxpayers point out that this decision has been amended by Treas.Dec. 2665, 20 Treas. Dec. Int.Rev. 45–47 (1918) to show that current deductions for the costs of raising livestock are optional:

> Where the cost of stock or farm products purchased in 1916 or any previous year for resale, or the expense of producing stock or products on the farm, has been claimed as a deduction or taken into consideration in ascertaining the farmer's liability to income tax for some year prior to 1917, and the stock or farm products so purchased or produced were sold during the latter year, the entire proceeds of the sale are to be returned as income for the year in which the sale was made, for the reason that the farmer, having once received the benefit of the deduction, is not again entitled to it. If, however, such cost or expense had not been claimed as a deduction, or had not been taken into consideration in ascertaining the farmer's liability to income tax for a previous year, the amount of such cost or expense may be deducted from the selling price of the stock or farm products and the difference only returned as income.

Of this quasi-statutory authority, I.T. 3666, the most favorable to taxpayers is

---

21. Section 29.23(a)–11 of Regulations 111 is the predecessor of § 1.162–12 and the third sentence of § 29.23(a)–11 is the same as the third sentence of § 1.162–12. *See* plaintiffs' post-trial original brief at 47 and appendix A and B.)

also the most recent, issued some thirty years after Treas.Dec. 2153 cited by the government. In addition, this same ruling was cited with approval by the Supreme Court in *Catto*.

Taxpayers find further support for their theory that costs of raising livestock are capital expenditures from a letter issued by John W. Snyder, Secretary of the Treasury, to Senator Walter F. George, Chairman of the Senate Finance Committee, dated June 27, 1952:

> Taxpayers have always been required to capitalize, rather than to deduct currently, the cost of buildings, machinery, equipment and other types of property used in the conduct of a trade or business and subject to the allowance for depreciation. Since livestock used by a farmer for draft, breeding, or dairy purposes, is property used in his trade or business and subject to the allowance for depreciation, farmers have long been required to capitalize the cost of animals purchased for those purposes.
>
> However, since the early days of the income tax, the regulations have *permitted* farmers to take current expense deductions for the cost of raising livestock intended for draft, breeding, or dairy purposes. The apparent reason for this regulation, which was introduced before favorable tax treatment had been granted to capital gains, was that the cost of raising an animal to maturity might be difficult to ascertain, particularly since the Bureau of Internal Revenue did not at that time recognize methods of approximating such costs. (emphasis added)

The letter was directed to Senator George in hopes of seeking legislation to require that such costs be capitalized so as to avoid the extreme disparity of tax treatment between cash basis and accrual basis taxpayers which resulted from capital gains treatment of profits from a sale of livestock held for breeding purposes.

It is apparent from the language used by the Secretary that he considered the current deduction of costs of raising livestock by cash basis taxpayers to be optional, the general rule providing for the capitalization of such expenses to be available to cash basis taxpayers, if they so desired. In fact, it was his intent to seek legislation to require that they be capitalized, and that the option be eliminated. This legislation was never passed.

■ This Court is not oblivious to the argument raised by the government, that under § 263 of the Code, as a matter of law, the Commissioner has no authority to determine that a purely capital item is currently deductible as a business expense unless such item is specifically excepted in § 263. In other words, the government contends that, if costs of raising livestock are found by the Court to be capital expenditures, and such expenditures are at the taxpayers' option deductible currently under Regulation § 1.162–12, the result will be that certain sections of the Code are inconsistent with other sections of the Code and Regulations. This conclusion does not necessarily follow when it becomes apparent that Regulations § 1.162–12 also provides a specific exception to the general rule that capital expenditures must be capitalized. This exception, unlike those of § 263, is not facially apparent, but it is clearly ascertainable upon study of the legislative history. That the Commissioner has traditionally accorded liberal treatment to farmers and ranchers in this situation is amply reflected in Treas.Reg. 45, art. 110, dated April 17, 1919 wherein it was recited that "The cost of feeding and raising live stock may be treated as an expense deduction, in so far as such cost represents actual outlay, but not including the value of farm produce grown upon the farm or the labor of the taxpayer." Almost the identical language is now con-

tained in the third sentence of ·Reg. § 1.-162–12,[22] thereby evidencing a continuity in policy by the Commissioner to carve out an exception to the general rule. That being so, no blatant inconsistency with the Code is evident. While § 270 reflects the intention of Congress to impose a "limitation on deductions allowable to individuals in certain cases," it must be remembered that § 270(b) was enacted to prevent the effects of § 270(a) from working a hardship or penalty upon ranchers and farmers and others in businesses where either extraordinary catastrophic or development expenses might inure.

■ Although it would not appear to be necessary as a consequence of the above discussion that this Court in this case reach the conclusion that certain sections of the Code and Regulations are in irreconcilable conflict, it does not follow that the government would prevail if this were the case. It is the duty of the Court to decide what "the construction fairly should be," as reflected through the legislative history, White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 83 L.Ed. 172 (1938), and to construe any doubts and ambiguities as to the meaning of the provision most favorably to the taxpayer, White v. Aronson, 302 U.S. 16, 20, 58 S.Ct. 95, 82 L.Ed. 20 (1937); Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211 (1917); 51 Am.Jur. Taxation § 316 (1944) and cases cited therein.

■ After long deliberation, not without considerable difficulty, I am compelled to conclude that costs of raising livestock are capital expenditures, that an option exists in the law as to the treatment of costs of raising livestock, and, thus, that such costs come within the realm of specially treated deductions under § 270(b) of the Code. If, as the government has admitted, the taxpayers' cattle constituted "primarily a breeding herd", Tr. at 325–26, then substantially all of the expenses of raising livestock for the year 1960 were spent for that breeding herd, and as such are capital expenditures that fall directly within the meaning and scope of the legislative history set out above; *see especially* the Senate Finance Committee Report, 1969–3 Cum. Bull. 423, 486.

### V.

### THE APPLICABILITY OF REG. 1.-471–6(a), THE ALTERNATIVE ARGUMENT OF PLAINTIFFS IN SUPPORT OF TAXPAYERS' OPTION UNDER SECTION 270(b) OF THE CODE

Having concluded that the costs of raising livestock can be capitalized and that an option exists under § 270(b) of the Code through the operation of Regs. § 1.162–12 for the treatment of such costs, this Court might conceivably avoid consideration of the alternative Regulation on which taxpayers rely, Regs. § 1.-471–6(a). However, it will be considered in the interest of completeness. This provision comes into play as to expenses incurred by the cattle rancher after the business has gained momentum, thereby generating and injecting into the tax picture inventories as an income producing factor. The taxpayers contend that § 1.471–6(a) under these circumstances also affords an option to the taxpayer sufficient to bring the expenses of raising such cattle within the purview of the Code.

Section 1.471–6, entitled "Inventory of livestock raisers and other farmers" provides that:

(a) A farmer may make his return upon an inventory method instead of the cash receipts and disbursements

---

22. Regs., § 1.162–12 provides in the third sentence:
The purchase of feed and other costs connected with raising livestock may be treated as expense deductions in-

sofar as such costs represent actual outlay, but not including the value of farm produce grown upon the farm or the labor of the taxpayer.

method. It is optional with the taxpayer which of these methods of accounting is used but, having elected one method, the option so exercised will be binding upon taxpayer for the year for which the option is exercised and for subsequent years, unless another method is authorized by the Commissioner as provided in paragraph (e) of § 1.446–1.

This section makes available to a farmer or rancher an election, at the time inventories first become an income producing factor, either to make his return upon the cash receipts and disbursements method, thus deducting expenses of raising livestock as incurred, or to adopt inventories, thus deferring as inventory costs such expenditures. Taxpayers urge that such an election places these expenditures "squarely within the purview of § 270(b) of the Code" and permits consideration of them as specially treated deductions.

To this effect, an analogy is drawn by taxpayers to the election to deduct intangible drilling and development costs under Treasury Regulation § 1.612–4(a), the relevant sections of which provide:

> In accordance with the provision of section 263(c), intangible drilling and development costs incurred by an operator * * * in the development of oil and gas properties may at his option be chargeable to capital or to expense. * * *

This section, too, affords the taxpayer an option of currently expensing or capitalizing intangible drilling costs. The taxpayers' choice, under both §§ 1.471–6(a) and 1.612–4(a), once made, cannot subsequently be changed without the consent of the Commissioner. Thus, it is urged, that one section should accomplish for the farmer what the other accomplishes for the oil producer.

The government denies the existence of two options and argues that "plaintiffs' position is based [only] upon the difference between the cash and accrual methods of accounting" and the original option between those methods, Def. Post-Trial Brief at 22.

Premised upon this statement, the government advances the following analysis and refutation of the taxpayers' theory: the computation of taxable income involves two separate processes. Initially, taxable income is computed under the method of accounting chosen by the taxpayer, and such computations are controlled by generally accepted accounting principles. It is only after the completion of this initial procedural step that legislative mandates and public policy exceptions are implemented.[23] It is in this second step in the computation of taxable income that certain specific statutory exceptions to generally accepted accounting principles permit special treatment of particular items of expense or income.[24] The government contends that the options contemplated under § 270(b) of the Code obviously refer only to these special statutory exceptions which comprise step two of this computation, and have nothing to do, as suggested by taxpayers, with the overall accounting method in use following the initial step in the determination of taxable income.

Although the government's recognition of the two procedural steps is basically sound, the statement of taxpayers' thesis is not. The option that taxpayers are contending for in this case in order to take them out of § 270(a) of the Code is not the option which they as taxpayers possessed in their first year to choose an accounting method. This was done before the dates material to this lawsuit. Rather, taxpayers are contending for the applicability of § 270(b) either (1) as a consequence of the spe-

---

23. *See, e. g.,* Int.Rev. Code of 1954 §§ 263, 264–69; Treas.Regs. § 1.263(a)–3(a) for examples of special codifications of such exceptions.

24. *Id;* Defendant's post trial brief at 30.

cial exception allowed under § 1.162–12 which has been discussed, *supra,* whereby they might elect to capitalize or expense the costs of raising their breeding herd—costs normally required to be capitalized, or (2) as a consequence of the option afforded by § 1.471–6(a), *sometime thereafter,* when cattle become an income producing factor, to (a) remain on the cash basis and treat such costs as an expense or to (b) switch to an inventory method and defer them.

The Regulations provide *as a general rule* that inventories *must* be used in computing taxable income "[i]n all cases in which the production, purchase, or sale of merchandise of any kind is an income-producing factor. * * *" Regs. § 1.446–1(a) (4) (i). Thus, a taxpayer who originally adopted the cash receipts and disbursements method has *no choice* under the general rule but to switch to the accrual method of accounting when inventories become an income-producing factor. *See also* Regs. § 1.471–1, which provides that "[i]n order to reflect taxable income currently, inventories at the beginning and end of each taxable year are necessary *in every case* in which the production, purchase, or sale of merchandise is an income-producing factor," (emphasis added). But a special exception, or option is granted to the farmer or rancher, who *"may* make his return upon an inventory method instead of the cash receipts and disbursements method. It is optional with the taxpayer which of these methods of accounting is used * * *" (emphasis added) Regs. § 1.471–6(a).

Accordingly, it is apparent that under § 1.471–6(a) farmers are given an option to utilize inventories subsequent to their initial choice of accounting method when such inventories become an income-producing factor, rather than a mandate or directive to do so as are most other taxpayers. A farmer on the cash basis thus has an election (1) to continue on that basis, deducting currently all costs of raising livestock, or (2) to switch to an inventory method (a combination of cash receipts and disbursements method and accrual method) and defer the costs as inventory. This second alternative allows the taxpayer to utilize the cash basis with special treatment for a certain item—inventory.

What emerges from analysis of this plethora of tax provisions is the hard considered conclusion that the taxpayers must prevail in this lawsuit as to the proper interpretation of § 270(b) of the Code. This was not this Court's immediate impression following the termination of the evidence at the trial, as the post-trial preliminary observations to counsel at that time bear out. Tr. at 362–73. When the government advances the argument that to accept the taxpayers' thesis is to defeat the overriding purpose of the statute and its equitable application to all taxpayers, its logic on the surface would seem to be unassailable. But a thorough examination of the legislative history and related authorities bearing on this area of the tax law serves only to indicate otherwise. Congress as well as the Commissioner in the issuance of the Regulations has acted to favor the farmer and cattle rancher in this particular situation, apparently on the theory that to ignore the uniqueness of their plight as to costs connected with raising livestock would work serious inequities upon these particular taxpayers.[25] This Court feels strongly obligated to implement the intent of Congress in this area of the law whenever such intent is ascertainable, as it is here, despite the policy arguments to the contrary advanced by the government which admittedly possess considerable visceral appeal. What this result actually means is that the big cattle rancher with a large and sophisticated cattle raising operation who, in view of the

25. Senate Finance Committee Report on § 270, Internal Revenue Code, 83rd Cong., 2d Sess., 3 U.S. Code Cong. & Adm. News 4671 (1954).

size of his expenditures, is the only rancher in a position to benefit from such legislative and administrative largesse has access to a tax loophole of considerable magnitude under the circumstances present in this case.[26]

■ Having met and decided the major issue in this lawsuit by concluding that cattle ranchers such as the taxpayers do have such an option under § 270(b) of the Code, there remains for the Court the question as to whether all or only a part of taxpayers' ranch expenses constitute "specially treated deductions." Based upon the evidence presented by testimony, the exhibits, stipulations of fact and other relevant material submitted at the trial, it is the finding of this Court that taxpayers' costs of raising livestock for the year 1960, exclusive of the "value of farm produce grown upon the farm or the labor of the taxpayers", Regs. § 1.162–12, were in excess of $174,000. The Court further finds that taxpayers had the option to expense currently or capitalize or defer such costs, under either Section 1.-162–12 or Section 1.471–6(a), and that such costs are specially treated deductions under Section 270(b). Thus, these specially treated deductions are excluded for the year 1960, and Section 270 does not apply to taxpayers for any of the years in question, because there is no consecutive five year period in which expenditures other than specially treated deductions exceed reported income by $100,000. Taxpayers are therefore entitled to judgment in this cause.

This Memorandum constitutes the Findings of Fact and Conclusions of Law of this Court. Counsel will submit, within twenty (20) days of entry of this Order, an appropriate judgment consistent therewith.

26. Section 270 of the Internal Revenue Code has been repealed as of December 30,

1969. Pub.L. 91–172, Title II, § 213(b), 83 Stat. 572 (1969).