PERRY N. DUGGAR AND PATRICIA J. DUGGAR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 178–76.    Filed November 9, 1978.

*Launch M. Magruder, Jr.,* and *James S. Nippes,* for the petitioners.

*Roy S. Fischbeck,* for the respondent.

IRWIN, *Judge:* Respondent determined deficiencies in petitioners' income tax for the calendar years 1972 and 1973 in the amounts $6,054.85 and $855.86, respectively. The only issue remaining for our decision is whether certain payments made by

petitioners for the leasing, maintenance, and care of cows, and for the maintenance and care of their calves represent currently deductible business expenses or expenditures which are capital in nature.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts along with attached exhibits are incorporated herein by this reference.

Petitioners, husband and wife, were residents of Jackson, Miss., at the time of filing their petition herein. They filed their joint Federal income tax returns for the taxable years 1972 and 1973 with the Internal Revenue Service Center at Chamblee, Ga. Since Patricia J. Duggar is a party hereto solely by reason of having filed a joint return with her husband for the years in issue, Perry N. Duggar alone will hereafter be referred to as the petitioner.

During the taxable years in issue, petitioner was a medical doctor engaged in the practice of anesthesiology. In January 1972, petitioner and several other investors entered into a three-part management agreement with Medical & Corporate Financial, Inc., doing business as Mississippi Simmental, Ltd. (hereafter sometimes referred to as Manager) under which petitioner, among other things, subleased 40 head of Angus brood cows. Petitioner's purpose in entering into this agreement was the development of a herd of purebred Simmental cattle, a breed of cattle favored in Europe because of their superior size, rapid growth, fertility, and adaptability. He felt that such an investment had good profit potential, and, in addition, was aware of its potentially favorable tax consequences.

Under the agreement, which was intended to get petitioner started toward the development of his herd, petitioner paid $100 to sublease each brood cow and $300 to maintain each cow and calf until such time as the calf was weaned (8 or 9 months). Mississippi Simmental, Ltd., was obligated to manage the leased cows and was required to care for them and their calves. However, petitioner was aware that Mississippi Simmental was utilizing Brumfield Plantation, with whom it had an agreement similar to the one with petitioner and from whom it had leased the 40 cows which it then subleased to petitioner, to fulfill its obligations under the agreement with petitioner. Each cow was

to be artificially inseminated with semen from purebred Simmental bulls. The agreement stated that the calves born to said cows were the property of petitioner. The leased brood cow was returned to its owner when its calf was weaned. Petitioner received a calf for each cow he leased, 20 of which were male and 20 of which were female. However, petitioner was not guaranteed a calf for each cow under his contract with Medical & Corporate Financial, Inc.

Utilization of artificial insemination was chosen because of the difficulty in getting Simmental bulls into the United States due to various import restrictions which made the cost of such an animal extremely high ($100,000). Each new generation of cows would again be inseminated until such time as petitioner's herd consisted of cows which were seven-eighths Simmental and bulls which were fifteen-sixteenths Simmental, considered purebred Simmental. Thus, in order to get a purebred cow required three successive breedings; in order to get a purebred bull a fourth breeding was necessary. Apparently the cost to purchase a weaned calf such as petitioner was to receive from the process outlined in the agreement would have been between $250 and $350.

Petitioner's activities in the cattle raising venture were minimal. The recordkeeping chores with respect to the project were placed on Medical & Corporate Financial, Inc. Petitioner personally visited Brumfield Plantation to look over the cattle only twice during the 2-year period in issue. Also, once the calves were weaned, petitioner had to decide whether to allow the manager to sell the male calves or to take possession of them himself. As to the female calves, petitioner had a third option, allow Manager to retain them and enter into Management Agreement Two for their care and maintenance until they reached breeding age (18 to 20 months) at a cost of $150 per head. In 1973, petitioner had 14 female calves come under Management Agreement Two. He elected to sell all male calves.

Because resolution of the issue before us is largely dictated by the effect of the agreement between petitioner and Medical & Corporate Financial, Inc., the agreement is fully set forth below:

### CATTLE MANAGEMENT AGREEMENT AND SUBLEASE

This Cattle Management Agreement and Sublease made and entered into by and between MEDICAL AND CORPORATE FINANCIAL, INC., d/b/a MISSISSIPPI SIMMENTAL, LTD., called "Manager", whose address is 5420

Interstate 55 North, Suite F. Jackson, Mississippi 39211, and DR. PERRY DUGGAR whose address is 1427 Woodfield Drive, Jackson, Miss. 39211 called "Lessee" or "Sublessee".

(1) Manager has entered into a Cattle Lease and Management Agreement with Brumfield Plantation, a partnership, of Inverness, Mississippi, herein called "Brumfield". Brumfield is the owner and operator of certain agricultural ranch lands in Mississippi devoted to row crop operations and livestock ranching and is in the business of buying, breeding, managing and selling cattle and caring for those cattle on livestock farms operated by him.

Manager is agreeable to subleasing certain of said cattle to Lessee herein and Lessee is agreeable to leasing said cattle upon the terms and provisions herein set forth:

MANAGEMENT AGREEMENT No. 1

(2) Upon the terms and conditions set forth herein and for the consideration set forth herein Manager subleases to Lessee for a period of time beginning January 3, 1972 and ending December 31, 1972 40 head of Angus brood cows which shall remain in the care, custody and possession of Brumfield. In consideration of the rent and management fee which Lessee agrees to pay to Manager, Manager agrees as follows:

(a) That the cows subject to this Agreement will be bred by artificial insemination to purebred Simmental Bulls that have outstanding performance records.

(b) To furnish all feed, water, supplements, breeding supplies, veterinary services and to manage and care for said leased cows in accordance with generally accepted practices of good animal husbandry.

(c) That Lessee shall own all calves born to said leased cows; that a live Simmental-Angus calf for each brood cow leased will be cared for the management fee herein set forth until weaning (8–9 months old). The exact weaning date will be determined by Brumfield. The sex of the calf crop will normally by 50% male and 50% female.

(d) To keep records of breeding, mark and identify the Simmental-Angus calves born to the leased cows and to maintain records as to the Simmental-Angus calves assigned to Lessee.

(3) After the calves are weaned, all male calves will be sold at the expense of Lessee unless Lessee elects to take possession of some or all of said male calves as hereinafter set out. Proceeds from the sale of male calves, less expense of the sale, will be remitted to Lessee. As to the female calves, Lessee shall have the following three options:

(a) Take possession of the calves at Brumfield Plantation, Inverness, Mississippi.

(b) Direct Manager to sell all female calves at the expense of Lessee in which event the proceeds of sale, less expense thereof, shall be remitted to Lessee.

(c) Leave the female calves with Manager under Management Agreement No. 2 hereafter set out.

All calves to be sold shall be sold as reasonably as practicable after Lessee notifies Manager to make the sale thereof. If Lessee elects to take possession of calves as provided above, said calves must be picked up at Brumfield

Plantation, Inverness, Mississippi, within two (2) weeks after Lessee notifies Manager. Upon Lessee's failure to pick up said calves within the allotted time, Lessee agrees to pay to Manager a maintenance fee of Ten Dollars ($10.00) per month (or part thereof) per calf until such time as Lessee picks up the calves.

(4) In consideration of the lease, care, maintenance and management of the Angus brood cows and care, maintenance and management of the calves until weaned, Lessee agrees to pay to Manager a rental (lease fee) of One Hundred Dollars ($100.00) per cow leased and a management fee of Three Hundred Dollars ($300.00) per Angus brood cow subject to this lease. One-half of the lease fee and one-half of the maintenance fee shall be paid in advance upon execution of this instrument. The balance of the maintenance and lease fee shall be paid in equal installments as follows: April 1, 1972, $66.67; July 1, 1972, $66.67; and October 1, 1972, $66.66 per cow.

MANAGEMENT AGREEMENT NO. 2

(5) Those female calves which Lessee does not sell, Manager agrees to furnish all feed, water, supplements, veterinary services and to manage and care for said calves in accordance with generally accepted practices of good animal husbandry so as to insure normal growth and development until the animal is old enough to be bred, which is estimated to be at the age of 18 to 20 months. This service will be provided for the fee of One Hundred Fifty Dollars ($150.00) per head payable in advance at the beginning of the post-weaning period. The exact breeding date shall be determined by Brumfield. Every precaution will be taken to care for the health and development of the animals during this period; however, Manager will not be responsible for losses except in the event of gross negligence.

MANAGEMENT AGREEMENT NO. 3

(6) If at the time the cattle subject to Management Agreement No. 2 have reached the proper age to breed Lessee does not then take possession of the cattle at Brumfield Plantation but elects to have the cattle bred and cared for, then Management Agreement No. 3 shall become effective and Manager agrees as follows:

(a) To continue to furnish all feed, water, supplements, breeding supplies, veterinary services and to manage and care for said cattle in accordance with generally accepted practices of good animal husbandry.

(b) To breed the cattle with artificial insemination to purebred Simmental Bulls, at Manager's expense, for two breedings, if necessary. Any additional breedings by artificial insemination will be provided at $15.00 per service. If the artificial breeding is unsuccessful, a bull of Simmental blood will be provided for natural breeding services at the cost of Manager. In the event the cow will not breed artificially or naturally, then, and in that event, the cow will be sold at the expense of Lessee and the proceeds thereof, less expense of sale, will be remitted to Lessee. Manager will reimburse Lessee for the proportionate part of the management fee for the year during which the cow is not maintained by Manager.

Under this stage of the Management Agreement (Management Agreement No. 3), the parties hereto recognize that the cattle will be owned by Lessee and

Manager makes no guarantee against death losses and does not guarantee a 100% live calf crop.

The term of Management Agreement No. 3 shall be for a period of twelve (12) months from the date of the first breeding of the cow.

The management fee payable to Manager under Management Agreement No. 3 shall be Two Hundred and Fifty Dollars ($250.00) per cow payable in advance.

(7) Lessee authorizes Manager to subcontract through Brumfield all the services which Manager agrees to provide herein for the leased cows and any calves born to them and to do all acts and things which Manager or Brumfield may consider useful and necessary in connection therewith. Manager is authorized to execute such certificates, affidavits and documents of similar nature that may be required by any agency of the government as Lessee's agent or attorney in fact.

(8) Lessee agrees not to assign this Cattle Management Agreement and Sublease without written consent of Manager and any such assignment shall not relieve Lessee of his liabilities and obligations hereunder.

(9) This Cattle Management Agreement and Sublease supersedes and replaces any prior agreement entered into between the parties hereto.

(10) The lease of the Angus brood cows terminates December 31, 1972 and this Agreement shall terminate thereafter at such time as neither Management Agreement No. 2 or Management Agreement No. 3 is in effect. In all events, this Agreement terminates at the conclusion of the period specified for Management Agreement No. 3. At this time, all cows and calves of Lessee must be sold or Lessee must take possession of them at Brumfield Plantation, Inverness, Mississippi, unless a new Management Agreement is entered into.

The terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto, their heirs, legal representatives, successors and assigns.

This instrument shall be executed in duplicate original counterparts.

IN WITNESS WHEREOF, this instrument is executed on this the 3rd day of January, 1972, to be effective from January 3, 1972.

Under the agreement set out above, petitioner expended $16,000 pursuant to Management Agreement One in 1972 and $2,100 pursuant to Management Agreement Two in 1973. Petitioner deducted both of these amounts as ordinary and necessary business expenses. Both amounts were disallowed in full by respondent as nondeductible capital expenditures.

## OPINION

In January 1972, petitioner, Perry N. Duggar, as lessee, entered into a Cattle Management Agreement and Sublease with Medical & Corporate Financial, Inc., d/b/a Mississippi Simmental, Ltd., under which petitioner leased 40 head of Angus brood cows. The leased cows were to be artificially inseminated

with purebred Simmental bull semen as the initial step in petitioner's attempt to develop a purebred Simmental brood herd. Mississippi Simmental, Ltd., was obligated to manage the leased cows and their calves and was required to provide land, shelter, feed, veterinary services, supplies, artificial insemination services, and record maintenance. According to the agreement, petitioner owned the calves born to the cows which he had leased and after the calves were weaned petitioner could take possession of the calves, direct that the calves be sold, or, with respect to the heifers, pay Mississippi Simmental, Ltd., $150 per heifer as a maintenance fee for the prebreeding age period. The agreement contemplated that the heifers would then be artificially inseminated with purebred Simmental bull semen and their offspring then would be three-fourths Simmental. This case involves only the expenses incurred by petitioner until his Simmental-Angus heifers reached breeding age.

Respondent sets forth a two-fold argument in attacking the deductibility of the expenditures in question. He first argues that petitioner was not a farmer and, therefore, is not entitled to the benefits of the accounting provisions applicable only to farmers. He further argues that even if we hold petitioner was a farmer, the substance of the transaction is a purchase of breeding cattle and the cost of said cattle must be capitalized notwithstanding petitioner's classification as a farmer under the Internal Revenue Code of 1954.

Petitioner counters by first asserting that he was indeed a farmer within the meaning of the Code. He then contends that the transaction is in substance precisely what it appears to be, that is, a lease of breeding cows for whose maintenance and care he is responsible and, therefore, both the rental expense and the cost of maintaining and caring for those breeders are deductible. Petitioner also argues that the cost of maintaining and caring for the calves is deductible because they were his property from birth. He further argues that once he elected to proceed under Management Agreement Two, the cost of maintaining and caring for those female calves is currently deductible. These deductions, he asserts, are to be taken under section 162.[1]

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue.

In an amended petition, petitioner also asserted deductibility under sec. 212. However, he did not discuss this on brief, and, in light of our resolution, we need not deal with its applicability.

The initial problem which we must resolve is whether petitioner is a "farmer" and is thus entitled to the benefits of sections 1.162–12 and 1.471–6(a), Income Tax Regs., which allow a cash basis farmer the option of expensing or capitalizing the costs of raising livestock. See, e.g., *Welder v. United States*, 329 F. Supp. 739 (S.D. Tex. 1971), affd. 461 F.2d 1269 (5th Cir. 1972). However, as to the expenses incurred in 1972, we believe it is unnecessary to resolve this question because we find those expenditures are capital in nature. Therefore, for purposes of analysis, we will assume arguendo that petitioner was a farmer within the meaning of the Code for that taxable year.

Section 1.162–12(a), Income Tax Regs., relating to the expenses of farmers, states in part: "The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay." It further states that: "Amounts expended in purchasing work, breeding, dairy, or sporting animals are regarded as investments of capital." Thus, the parties are at issue over which portion of that regulation is applicable to the expenditures in question.

We begin our analysis with an examination of *Wiener v. Commissioner*, 58 T.C. 81 (1972), affd. 494 F.2d 691 (9th Cir. 1974). In that case petitioners were interested in building a herd of dairy cattle. To that end petitioners paid seller $330 in return for which seller would purchase a heifer calf and maintain her for approximately 28 months, until she had borne a calf and was ready for dairy use. This maintenance included all the basic functions of raising a calf for the 28-month period such as feeding, breeding, veterinary care, supervision, and overhead charges, including death and sterility costs. The petitioners were not involved in this process of raising the calves to mature dairy cows. Of the $330, $302 was designated as "raising cost" and $28 as the "purchase price" for each calf acquired. If a calf were to die or be culled for any reason prior to entering the milking stream of a dairy, seller would either substitute another cow or repay petitioners their $330 investment. If one of the cows for which petitioners had paid was sold before being placed in a dairy, petitioners were refunded $330 regardless of the cow's sales price. The cows which petitioners had "purchased" were not specifically designated as theirs until they had reached maturity and were rented to a dairy. For instance, in those cases

where the seller sold the cows before they had entered the dairy stream, they and not petitioners were designated as the seller.

On these facts we held the entire $330 was a nondeductible capital expenditure even though $302 was allegedly a cost of raising the calves. We found that petitioners did not acquire ownership of the animals until they had borne calves and were leased for dairy use. Consequently, petitioners had to capitalize the entire $330 outlay as the purchase price of mature cows ready for dairy use. We held that the designation of the payments as maintenance and care was irrelevant and determined that their true nature was as capital outlays for the purchase of mature cows at which time the risk of loss finally passed to petitioners. Hence the expenditures in issue were nondeductible.

We believe the substance of the transaction here in issue was a purchase of weaned calves rather than the rental and care of breeding cows. It was not until the calf was weaned that any risk of loss passed to petitioner. Just as the petitioners in *Wiener* used their arrangement as a means of obtaining the ownership of cows ready for dairy use, the petitioner herein used this lease agreement as a means to effect calf ownership from which he could proceed to build his herd. In each case the cost was necessary to the creation of the desired asset—in *Wiener*, a mature cow ready for dairy use; in the instant case, a weaned calf. As such, neither the costs of leasing nor those expended for maintenance and care are deductible up to the point the calves were weaned.

However, as to the $2,100 which petitioner expended in 1973 to maintain 14 weaned heifers, we believe different considerations are applicable. This amount, $150 for each heifer calf which petitioner desired to retain for future breeding, was incurred to care for and maintain livestock which he owned until the animal was old enough to be bred. Just as this Court in *Wiener* focused on the point at which the taxpayer bore the risk of loss to determine the time the taxpayer obtained ownership, we feel we should be similarly guided in this case. Once the calves were weaned, the risk of loss became that of petitioner. At this point he owned the calves and bore the risk of loss due to death, absent gross negligence attributable to Manager. See also *Maple v. Commissioner*, 440 F.2d 1055 (9th Cir. 1971), affg. T.C. Memo. 1968–194.

Respondent deems it significant that no specific assignment of brood cows or weaned female calves was made as among the various investors, indicating ownership of the calves was not vested in petitioner prior to the time such specific assignments were made, which he claims was not until breeding age. He points to *Wiener* as standing for the proposition that absent specific assignment of the calves as between the various investors, petitioner could not be considered as owning any calves.

However, in *Wiener* there was no apparent reason, other than lack of ownership, for nonassignment. In this case the lack of specific assignment was to spread the fortuitous circumstances of the different qualities of each calf born not only in terms of sex but also in terms of quality within a sex grouping, among all the participating investors so that each investor's ownership in the resultant calf crop would be as homogeneous as possible. Also, the fact that each individual investor could immediately after weaning determine the disposition of both his male and female share of the calf crop indicates that the investors held an ownership interest once the calves were weaned.

Respondent also argues that any risks of loss borne by petitioners subsequent to weaning were nominal and should be disregarded. However, the fact remains that the risks associated with raising the calves from this point were on petitioner. That they were nominal was merely characteristic of the nature of the investment and the fact that as part of the investment the calves were given a high quality of care. Nor does the fact that the manager remained liable for risks due to his own gross negligence evidence that the risks of ownership had not fully shifted to petitioner. Merely because petitioner opted to have a third party care for and maintain his calf crop and as a result thereof said party was liable in the performance of those duties for acts of gross negligence, does not mean that someone other than petitioner bore the risk of loss. See *Maple v. Commissioner*, *supra* at 1056. The arrangement between Manager and petitioner was actually no more than a bailment, with petitioner paying a fee in return for the care of his livestock. It is not unusual in such a relationship for the bailee to assume responsibility for damage caused to the bailed property by his own gross negligence.

We must now determine if petitioner qualifies for the favored

status of "farmer" under the Code for the taxable year 1973. If he does, he will then be entitled to deduct the $2,100 which he paid in 1973 for the care of his female calves. If not, then that cost, too, must be capitalized as a cost of raising livestock. See S. Rept. 91–552 (1969), 1969–3 C.B. 423, 484, containing a brief discussion of the farm accounting provisions, part of the legislative history of the Tax Reform Act of 1969.

We must determine what it takes to achieve the status of a "farmer" for purposes of the Internal Revenue Code. In the instant case, petitioner was the owner of the 14 heifers. Significantly, he was interested in the growth process of his calves. He utilized Medical & Corporate Financial, Inc., which in turn utilized Brumfield Plantation, to handle the care and maintenance of his cattle, although the calves were completely subject to petitioner's ownership, to do with what he pleased. Subsequent to weaning, he could personally take possession of his calves, have them sold, or enter into Management Agreement Two.

Petitioner visited Brumfield Plantation, the place where his cattle were located, twice during the 2-year period in issue. The basic records as to the transaction were to be kept by Manager. It is clear that the primary reason for petitioner's endeavor was to develop a herd of purebred Simmental cattle which he believed had excellent profit potential. It is also clear that he was aware of the potentially favorable tax consequences associated with this method of raising a herd of cattle.

A situation very similar to the one now before us was dealt with by this Court and the Ninth Circuit in *Maple v. Commissioner, supra.* In that case two limited partners in a limited partnership were allowed to deduct certain amounts incurred or expended in connection with the development of an orchard. The limited partnership was merely owner of citrus seedlings. They contracted out the raising of the seedlings and the seedlings were raised on property owned by the contractor. The risk of loss due to causes other than fault of the contractor was on the limited partnership. In holding that the two limited partners were farmers the court stated:

Whether or not one is a farmer for tax purposes does not depend on his tilling the soil by his own labor rather than by that of hired hands, tenant farmers, or even professional nurserymen. Where, as here, the taxpayers assume the risk that the crop will never be harvested due to unforeseen circumstances and the

crop is related to the taxpayers' farming endeavors, the expenses they incur with regard to that crop are farming expenses. (Cf. Income Tax Reg. secs. 1.61–4(d), 1.182–2, 1.175–3.) Our taxpayers bore that risk and are just as entitled to the tax benefits afforded farmers as if they had raised the trees with their own hands. [440 F.2d at 1057.]

We think that under the standard as enunciated in *Maple v. Commissioner, supra,* petitioner qualified as a farmer in 1973. In *Maple* the court deemed the key factor to be the bearing of the risk of loss. See also *Maple Leaf Farms, Inc. v. Commissioner,* 64 T.C. 438, 448 (1975). There is no question that petitioner bore the risks associated with raising his calves from the weaning to the breeding stage, other than loss due to gross negligence attributable to the manager. We believe petitioner herein and his ownership rights in the subject calves satisfy the standard set forth in *Maple.* As such he is entitled to deduct those costs of maintenance and care associated with the raising of weaned female calves to breeding age.

*Decision will be entered under Rule 155.*