ROBERT J. VINSON and OLA M. VINSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; A. STARKE TAYLOR, JR. and CAROLYN TAYLOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vinson v. Commissioner
Docket Nos. 4701-77, 5115-77.
United States Tax Court
T.C. Memo 1979-175; 1979 Tax Ct. Memo LEXIS 350; 38 T.C.M. (CCH) 740; T.C.M. (RIA) 79175; May 2, 1979, Filed Harry M. Brants, for the petitioners. J. Michael Brown, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Addition to tax Docket No.
Year
Deficiency
Sec. 6651(a)(1) [1]
4701-77
1972
$4,246.84
1973
3,924.60
1974
4,268.56
5115-77
1974
3,709.00
$371.00
*351 Concessions having been made, the sole issue remaining for decision is whether certain expenditures incurred by petitioners in the pre-productive years of their pecan orchards are nondeductible capital expenditures or ordinary and necessary business expenses. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Robert J. Vinson (Vinson) and Ola M. Vinson, husband and wife, resided at Rockwall, Texas, at the time the petition herein was filed. They filed their Federal income tax returns for the years in issue, using the cash basis method of accounting, with the Director, Internal Revenue Service Center, Austin, Texas. Petitioners A. Starke Taylor, Jr. (Taylor) and Carolyn Taylor, husband and wife, resided at Dallas, Texas, at the time of filing their petition herein. They filed their Federal income tax return for the year at issue, using the cash basis method of accounting, with *352 the Director, Internal Revenue Service Center, Austin, Texas. Since its incorporation in 1971, Wolfe Pecanlands, Inc. (Wolfe) has engaged in the business of developing and operating high density pecan orchards. On or about December 27, 1972, Vinson acquired from Wolfe 51.18 acres of land in Comanche County, Texas. On or about July 1, 1974, Taylor acquired from Wolfe 44.58 acres of land in Comanche County, Texas. At or about the time of said acquisitions, Vinson and Taylor each also executed a Tree-Growing and Orchard-Management Contract (the Contract) with Wolfe. Each contract recited the acreage acquired and that "Buyer [Vinson, Taylor] desires to plant, grow and operate an orchard of hybrid pecan trees on the land and to engage Grower to provide these services according to the provisions of the Contract." Each Contract contained the following pertinent definitions: Pecan Tree and/or Pecan Seedling -- a tree grown from a pecan seed but not yet budded or grafted with a paper shell pecan variety; Hybrid Pecan Tree -- a pecan tree budded or grafted with a paper shell pecan variety; Budding or Grafting -- the process of affixing a bud or graft limb from a *353 paper shell pecan tree on a pecan seedling to obtain more desirable pecans; Each Contract provided for two phases: (1) a tree growing phase for the first five years and (2) a ten-year orchard management phase thereafter. With respect to the tree growing phase, the Contract provided: TREE GROWING SERVICES
1. PLANTING AND GROWING. For purposes of this Contract, the first five (5) years shall be considered the tree growing period. Grower, at its expense and with its own or contract personnel and equipment, agrees to perform or cause to be performed in a good and workmanlike manner, all of the normal activities and functions which in Grower's opinion are necessary to plant and grow an orchard of hybrid pecan trees on the land and to bring such trees to a high density bearing stage in the year immediately following the five-year growing period, which functions shall specifically include: (a) the planting of pecan seed or pecan seedlings on the land in such manner as to obtain the maximum number of trees per acre consistent with good horticultural practices; (b) the budding or grafting of the pecan trees in the orchard with hybrid pecan varieties which in Grower's *354 opinion are suitable for the land; and (c) cultivating, pruning, caring for, spraying, irrigating, fertilizing, and all other functions reasonably necessary to plant and grow an orchard of hybrid pecan trees for commercial production of paper shell pecans. * * *
3. HORTICULTURAL DECISIONS. It is expressly understood that during Phase I of this Contract [tree growing phase] the Grower is granted exclusive control of all matters relating to the planting, growing and development of the pecan orchard on the land, and its judgment shall be conclusive as to all horticultural and agricultural practices to be conducted. Wolfe plants 100,000 seeds per acre in its own seed bed in February each year and they grow there for 10 or 11 months. The seedlings are then dug up, the weak and malformed ones are discarded, and the good ones are graded according to size and are sold. The good seedlings are then transplanted. During the transplanting process, all but 12 inches of the tap root of the seedling is clipped off, causing the root to branch into three to eight additional modified tap roots after the seedling is planted in the orchard. One-year-old seedlings were transplanted *355 to petitioners' land (orchard) at the rate of approximately 200 seedlings per acre. At the time of transplanting, the risk of loss passed from Wolfe to the petitioners. Wolfe did not guarantee petitioners that their orchards would be productive. The seedlings grow approximately two years in the orchard until they are about one-half inch in diameter at the base. Then a "window" is cut approximately three inches from the ground in the cambium layer of the seedling pecan tree and a single bud from a known variety of a papershell pecan is affixed. This process is called "budding." About 120 seedlings per acre of petitioners' land survived to time of budding. In the spring following the budding of the seedling, all branches other than the bud are removed. This is called "forcing," because it forces the sap from the root system to flow to the bud and the tree develops a top from four to six feet in height in six months. The top is grown from one bud and, therefore, the tree has the characteristics of that bud. In the winter following the forcing procedure, some trees are relocated so that the density is about 120 trees per acre. The budding process, although required under the *356 Contract, is not necessary in order for seedlings to develop into trees which will grow commercially marketable pecans. The reason for budding seedlings is to control the variety of pecans. All pecans are hybrids because pecan trees cannot pollinate themselves. If the seedlings are not budded, the variety and quality of the fruit that the tree will bear cannot be determined until the pecan is produced. Budding the seedling enables the grower to choose the variety that has the largest commercial appeal. The trees are productive in the third growing season following the forcing, i.e., the fall of the sixth year after the seedlings are initially planted. The anticipated bearing life of the pecan trees produced from the seedlings and the budding and grafting was in excess of one year. Throughout the tree growing phase, Wolfe sprays, cultivates the land around the seedlings, fertilizes, waters, prunes, and irrigates the orchard. These activities are referred to as "cultural practices." For the services to be performed by Wolfe during the tree growing phase and for all seedlings, buds, grafts, fertilizer, labor, and other materials and supplies to be used by Wolfe during such *357 period, Vinson agreed to pay Wolfe the total sum of $51,180 ($1,000 per acre), payable in five annual installments of $10,236 each, plus interest on the unpaid balance at the rate of 5 percent per annum, and Taylor agreed to pay Wolfe the total sum of $44,580 ($1,000 per acre), payable in five annual installments of $8,916 each, plus interest on the unpaid balance at the rate of 6 percent per annum. Of the total foregoing cost, $60 per acre was allocated to the cost of budding or grafting pecan trees with hybrid pecan varieties and the cost and the planting of the seedlings. Vinson paid Wolfe one annual installment in the amount of $10,236 in 1972 and an annual installment in the same amount, plus accrued interest, in each of the years 1973 and 1974; Taylor paid Wolfe one annual installment in the amount of $8,916, plus accrued interest, in the year 1974. The parties have stipulated that the total cost to Vinson of $51,180 and to Taylor of $44,580 during the tree growing phase of the Contract is allocated as follows: Type of Service
Percent
Cost of seedlings, transplanting same
from seed beds to petitioners' trancts,
and budding the trees in the orchard
with hybrid pecan varieties
6
Materials, supplies, and labor costs
in cultivating and maintaining the
petitioners' trees while they are
maintained in the orchard and prior
to the budding of the trees
19
Materials, supplies, and labor costs
in cultivating and maintaining the
trees after they have been budded
75
*358 In the 10-year orchard management phase, the Contract provided for Wolfe to manage the petitioners' pecan orchards, including shaping the trees, cultivating, irrigating, spraying, thinning, and harvesting. After reimbursement to Wolfe for all out-of-pocket operating and management expenses, the sales proceeds of pecans were to be distributed 25 percent to Wolfe and 75 percent to the petitioners. OPINION The issue is whether petitioners' "cultural practices" expenditures prior to the budding of their pecan trees are nondeductible capital expenditures, as respondent contends, or deductible expenses, as petitioners contend. The amount in dispute is 19 percent of the total amount payable by petitioners during the tree growing phase of the Contract. See p. 9, supra. Neither petitioners' capitalization of the cost of seedlings, transplanting of seedlings, and budding of the trees (6 percent of the total cost) nor their deduction as expenses of "cultural practices" expenditures after the budding process (75 percent of the total cost) is in question. Section 1.162-12(a), Income Tax Regs., provides, in relevant part, that "[amounts] expended in the development of farms, orchards, *359 and ranches prior to the time when the productive state is reached may, at the election of the taxpayer, be regarded as investments of capital." This regulation gives farmers the option of capitalizing or deducting expenditures in the pre-productive period of an orchard where the expenditures would be deductible if incurred during the productive stage of an orchard. Estate of Wilbur v. Commissioner,43 T.C. 322, 323-324, 327 (1964). Such expenditures have characteristics of both capital outlays and ordinary expenses and, thus, fall within a "band of gray." Estate of Wilbur v. Commissioner,supra at 327-328. The regulation does not, however, allow a taxpayer to deduct expenditures that are clearly capital in nature. Thompson & Folger Co. v. Commissioner,17 T.C. 722, 724-728 (1951). See McBride v. Commissioner,23 T.C. 901 (1955). Expenditures which are preparatory, rather than developmental, such as expenditures for clearing land, installing an irrigation system, and planting trees, are clearly capital in nature and fall outside the scope of the regulation. Thompson & Folger Co. v. Commissioner,supra; *360 McBride v. Commissioner,supra.
Respondent contends that section 1.162-12(a), Income Tax Regs., is inapplicable because the expenditures in question were clearly capital in nature. He claims that, in substance, petitioners contracted to acquire hybrid (papershell) pecan trees of known varieties and, therefore, all costs prior to the budding process (which results in the trees being of known varieties rather than of indeterminate varieties) are part of the cost of acquisition of a capital asset. We think the record does not support respondent's position. Petitioners purchased seedlings which had been grown on Wolfe's land. The seedlings were transplanted to each petitioner's land and at that time each petitioner assumed the risk of loss. From that point on, he was the owner of the orchard and Wolfe merely supplied services. Maple v. Commissioner,T.C. Memo. 1968-194, affd. 440 F.2d 1055 (9th Cir. 1971); Wagner Mills, Inc. v. Commissioner,T.C. Memo. 1974-274, affd. without opinion 530 F.2d 827 (8th Cir. 1976). See Duggar v. Commissioner,71 T.C. 147 (1978). Cf. Merrill v. Commissioner,40 T.C. 66, 74 (1963), *361 affd. per curiam 336 F.2d 771 (9th Cir. 1964). The fact that the ultimate objective of the contracts was to give the petitioners hybrid (papershell) pecan trees of known varieties is not determinative. As the court stated in Maple v. Commissioner,440 F.2d 1055, 1056 (9th Cir. 1971), affg. T.C. Memo. 1968-194: The Commissioner suggests that if a man wishes to produce shoes, he can buy a shoe factory or he can build one. The cost of getting ready to begin the manufacture of shoes, however, must be capitalized whether that cost is embodied in the expense of building a factory or in the price paid for one that is already built. The Commissioner is right about shoemakers. But shoemakers and farmers are not treated in parallel ways by the code and by the regulations. * * * Cf. Van Raden v. Commissioner, 71 T.C.     (Mar. 29, 1979); Kinley v. Commissioner,51 T.C. 1000 (1969), affd. without opinion     F.2d     (2d Cir. 1970, 26 AFTR 2d 70-5127, 70-2 USTC par. 9462). Respondent further argues for capitalization of the amounts at issue by contending that pre-budding cultural practices expenditures *362 are preparatory. In making this argument, he attempts to lump together the cultural practices expenditures and budding process and thereby treat them both as preparatory. The difficulty with this approach is that it assumes that the line between preparatory and developmental expenditures is strictly a chronological one and fails to note that we have looked to the nature of the expenditures as well. Thus, from the fact that budding expenditures are preparatory and, therefore, capital in nature, it does not follow that all expenditures that precede budding are capital in nature.Maple v. Commissioner,supra; Wagner Mills Inc. v. Commissioner,supra.
Respondent relies heavily upon Ashworth v. United States, an unreported case ( S.D. Ill. 1971, 28 AFTR 2d 71-5976, 71-2 USTC par. 9710), where the District Court disagreed with the result we reached in Maple and stated that "the costs of developing a seedling into a transplantable orange tree are preparatory and therefore must be capitalized." There are several reasons which obviate the need to resolve whatever conflict may exist between the views of this Court and that of the District Court. *363 The District Court decision in Ashworth was rendered prior to the affirmance of our decision in Maple by the Ninth Circuit Court of Appeals and prior to our subsequent decision in Wagner Mills and its affirmance by the Eighth Circuit.Additionally, there are two important factual differences.First, in Ashworth the expenditures involved related to activities prior to transplanting whereas, in the instant case, the activities in question took place subsequent to transplanting. Second, the seedlings in this case were commercially viable prior to budding, because a pecan tree will produce commercially marketable pecans without being budded, which was not the situation in Ashworth, since an orange tree that has not been budded will not produce an edible orange. Rev. Rul. 75-405, 1975-2 C.B. 64, is inapplicable for the same reason. In this connection, we note that the fact that respondent, in that ruling, disagreed with the decisions in Maple and Wagner Mills is irrelevant; respondent may not by a unilateral ruling bootstrap himself into the result he seeks in a litigated case. Minnis v. Commissioner, 71 T.C.     (Mar. 26, 1979). In sum, *364 we adhere to the position we took in Maple and Wagner Mills and hold that petitioners should be required to capitalize only 6 percent of the total amount of the payments to Wolfe and are entitled to a current deduction for the remaining 94 percent. With one exception, the parties appear to be in agreement that the consequence of our decision is that 94 percent of each annual payment to Wolfe during the years in question is deductible. That exception relates to respondent's contention that, as to Vinson, 75 percent of each annual payment to Wolfe in 1972 and 1973 should be disallowed on the ground that it represents a prepayment for services to be performed by Wolfe during the last three years of the growing period. [2]
*365 In taking his position, respondent argues that in this case Vinson's method of reporting materially distorts income. Relying on his authority under section 446(b), which requires a method of accounting that will clearly reflect income, and on Rev. Ruls. 68-643, 1968-2 C.B. 76, and 75-152, 1975-1 C.B. 144, he attempts to fit this case into the mold of prepaid interest and prepaid feed cases. Vinson contends that, as a cash basis taxpayer, he is entitled to deduct 94 percent of each installment (100 percent less the 6 percent that is capitalized). At the outset, we note that, in his deficiency notice to the Vinsons, in respect of the years 1972 and 1973, respondent raised only the capital expenditure versus current deduction issue and posited his disallowance on section 263. Such being the case, we think that respondent has raised a new issue as to which he should bear the burden of proof. Estate of Falese v. Commissioner,58 T.C. 895 (1972); Rule 142(a), Tax Court Rules of Practice and Procedure.
Respondent relies on the parties' stipulation that 19 percent of the total amount paid during the tree growing phase was allocable to cultural practices *366 prior to budding. However, as we understand the stipulation, it simply reflects an allocation of the total amounts paid for the services that were actually performed. Although the Vinson Contract enumerated specific functions that were to be performed by Wolfe, it did not provide for a specified quantum of services in each year. Rather, the essence of the agreement was that Vinson would pay Wolfe $1,000 per acre in five annual installments and Wolfe would do whatever was necessary to plant and grow an orchard of hybrid pecan trees of known varieties. The percentage of total services that would be performed in each year was not determined in advance. Nothing in the oral testimony contradicts this analysis. Thus, on the record before us, we would conclude, irrespective of the location of the burden of proof (see p. 18, supra), that there was no prepayment in the first two years for services to be performed in the last three years. [3]
*367 Accordingly, we hold that petitioners may deduct 94 percent of each installment in the year paid.
Decisions will be entered under Rule 155.
Footnotes
1. All section references, unless otherwise noted, are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question.↩
2. Vinson claims a deduction for 94 percent of each annual payment for 1972, 1973, and 1974. For 1974, Taylor deducted $6,241, and amount representing the payment of $8,916 less six percent of the total payments for the growing period ($44,580) or $2,675. Respondent does not dispute Taylor's treatment and concedes (for reasons which are not entirely clear to us) that Vinson is entitled to deduct 94 percent of his payment to Wolfe in 1974. At the trial, it was understood that Vinson and Taylor should be treated the same and we expect this understanding to be reflected in the Rule 155 computation, including any resulting overpayment since claim therefor was made in the Taylor petition.↩
3. Respondent makes no argument that, because the 1972 and 1973 payments to Wolfe were in December of each year, such amounts should for that reason be treated as nondeductible prepaid expenses. Cf. Burck v. Commissioner,533 F.2d 768 (2d Cir. 1976), affg. 63 T.C. 556↩ (1975).