T.C. Memo. 2000-206


UNITED STATES TAX COURT


OTIS W. JORDAN AND ALMA F. JORDAN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16084-97.                    Filed July 5, 2000.


Otis W. Jordan and Alma F. Jordan, pro sese.

Dustin M. Starbuck, for respondent.


MEMORANDUM OPINION


CARLUZZO, Special Trial Judge: Respondent determined a
deficiency of $4,423 in petitioners' 1994 Federal income tax.

The issue for decision is whether petitioners are entitled
to deductions claimed on a Schedule F, Profit or Loss From
Farming.

Background

Some of the facts have been stipulated and are so found. Petitioners are husband and wife. They filed a timely 1994 joint Federal income tax return. At the time the petition was filed, petitioners resided in Amissville, Virginia. References to petitioner are to Alma F. Jordan.

During all relevant times, petitioners lived on a 20-acre farm. They constructed a new barn on their farm, or substantially improved an existing one, during 1994. Petitioners own several thoroughbred race horses. They acquired their first race horse in 1986. By 1994 they owned six broodmares that, except when boarded at a race track during a racing season or elsewhere for breeding purposes, were kept at their farm. The horses are not used for recreational riding purposes. At least two of the horses, Jordan's Tan and Hilarious Astro, were entered in various thoroughbred racing events prior to the year in issue. During 1993 Jordan's Tan earned purses totaling $6,208 from at least 12 races at Charles Town Races, in Charles Town, West Virginia.

Petitioners intend to acquire a stable of race horses by mating their broodmares with stallions owned by others. Their plan is to produce foals that, after appropriate training, will develop into successful thoroughbred race horses. Consequently and typically, the primary source of income that petitioners

earned, or expect to earn from their horse racing activity resulted, or will result, from purses.

As of the date of trial, for any given year since acquiring their first race horse in 1986, the income earned from their race horses has never exceeded the expenses that they incurred to maintain, race, and breed their horses.

During 1994 petitioners entered into two stallion service contracts. In one they agreed to mate Jordan's Tan with Gilded Age; the stud fee was $750. In the other they agreed to mate Hilarious Astro with Two Punch; the stud fee was $3,500. Two Punch is the grandson of a Kentucky Derby winner. Over the years, Two Punch's offspring have earned over $1,000,000 in purses. In the latter stallion service contract, petitioners were guaranteed "a live foal that can stand up and nurse without assistance by midnight of the seventh day after the day of birth". The entire contract with respect to the stallion service contract involving Jordan's Tan has not been made part of the record, but it appears that it contained a similar guaranty.

Hilarious Astro produced a foal in 1994 as a result of being bred to Two Punch. In 1996, the foal ran into a fence and injured its leg.

During 1994, Otis Jordan was employed by Superior Paving Corp. His wages from that employment for that year were $42,128.20. Other than the horse racing activity, his wages were petitioners' sole source of income. He devoted some time to the

horse racing activity, but petitioner, who was not otherwise employed during 1994, was involved in the activity on a daily basis. Petitioners hired a neighbor who assisted petitioner in feeding and otherwise caring for petitioners' horses. They paid the neighbor $2,250 during 1994.

Petitioners did not maintain formal books of account for their horse racing activity. Many of the expenses of the activity were paid from their personal joint checking account; other expenses were paid in cash. Cash expenditures were sometimes noted on slips of paper. They kept numerous receipts evidencing the purchase of feed, hay, and various supplies from a variety of vendors. At least one of the race tracks provided petitioners with a summary of the earnings generated and expenses incurred on a horse-by-horse basis at the race track. Veterinary and boarding fees are reflected on various summaries provided by the farms where petitioners' horses were boarded.

Petitioners' 1994 Federal income tax return was prepared by a professional return preparer. Petitioners reported items attributable to their horse racing activity on a Schedule F included with that return. On that schedule, petitioners reported gross income of $300.26 from "cooperative distributions" and a "Federal and state gasoline or fuel tax credit or refund". The following deductions (amounts are rounded) are claimed:

| Description | Amount |
| --- | --- |
| Advertising | $    59 |

| | |
|---|---:|
| Custom hire | 1,600 |
| Horse feed | 539 |
| Hay | 2,215 |
| Insurance | 818 |
| Mortgage interest | 1,666 |
| Other interest | 1,495 |
| Labor hired | 2,250 |
| Boarding | 4,435 |
| Miscellaneous | 1,800 |
| Repairs/maintenance | 2,275 |
| Supplies | 5,307 |
| Taxes | 1,892 |
| Veterinarian | 1,070 |
| Jockey fees | 66 |
| Legal fees | 250 |
| License | 25 |
| Breeding fees | 4,250 |
| Horse showing | 100 |
| License | 25 |

The deduction for supplies appears to represent amounts spent to build or substantially improve a barn. The above deductions total $32,137. For reasons unexplained, on the line designated "Total expenses" on the Schedule F, petitioners entered $29,495.94. This amount was apparently used in calculating the reported net farm loss of $29,195.68.

In the notice of deficiency, respondent disallowed all of the expenses claimed on the Schedule F.

Discussion

Consistent with the manner in which petitioners filed their 1994 return, they contend that the deductions claimed on the Schedule F are allowable as trade or business expenses.

In general, section 162(a)[1] allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. In order for an activity to be considered a taxpayer's trade or business for purposes of section 162, the activity must be conducted "with continuity and regularity" and "the taxpayer's primary purpose for engaging in the activity must be for income or profit". <u>Commissioner v. Groetzinger</u>, 480 U.S. 23, 35 (1987).

Respondent argues that the deductions here in dispute are not allowable under section 162(a). According to respondent, petitioners' horse racing activity did not constitute a trade or business during the year in issue because petitioners did not engage in that activity for profit.

The test of whether a taxpayer conducted an activity for profit is whether he or she entered into, or continued, the activity with the actual or honest objective of making a profit. See <u>Keanini v. Commissioner</u>, 94 T.C. 41, 46 (1990); <u>Dreicer v. Commissioner</u>, 78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's profit objective must be bona fide, taking into account all of the facts and circumstances. See <u>Keanini v. Commissioner</u>, <u>supra</u> at 46; <u>Dreicer</u>

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for 1994. Rule references are to the Tax Court Rules of Practice and Procedure.

v. Commissioner, supra at 645; Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Whether a taxpayer engaged in an activity with an actual and honest objective of realizing a profit must be determined year to year. See Golanty v. Commissioner, supra at 426; sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to the taxpayer's statement of intent. See Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); sec. 1.183-2(a), Income Tax Regs.

The following factors, which are nonexclusive, are taken into account in deciding whether an activity is engaged in for profit: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his or her advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. See sec. 1.183-2(b), Income Tax Regs.

We have considered similar issues in numerous other cases and, from time to time, include in our discussion a factor-by-

factor analysis in those situations where it is helpful to do so. See, e.g., Phillips v. Commissioner, T.C. Memo. 1997-128. In this case, we consider the burden of discussing each of the above factors to outweigh the benefits of doing so. No one factor is determinative, see sec. 1.183-2(b), Income Tax Regs., some factors are not applicable, and those that are provide little guidance when considered separately. For example, respondent's position is strongly supported by the history of annual losses suffered by petitioners since they began their horse racing activity. A consistent pattern of losses suggests the lack of a profit motive. See Golanty v. Commissioner, supra; sec. 1.183-2(b)(6), Income Tax Regs. On the other hand, given the nature of the activity involved, it is not improbable that petitioners' cumulative loss could be recouped on the back of a single successful foal. Many of the foals sired by Two Punch (the stallion to which one of petitioners' broodmares was mated) successfully competed as thoroughbreds. As noted in the applicable regulation, "an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." Sec. 1.183-2(b)(7), Income Tax Regs. We consider petitioners' horse racing activity to be a highly speculative venture.

Guidance gleaned from separate discussions of other factors is no less ambivalent, and comparisons to previously decided cases add little towards the resolution of the controversy here. Other cases "turn upon their own facts and no useful purpose would be served by reviewing the conclusions reached in other cases based upon the records made therein." Bessenyey v. Commissioner, supra at 274.

Nothing in the record in this case suggests that petitioners had any affectionate attachment to any of their race horses in particular, or to horses in general. They did not use their horses or farm for recreational purposes. Although mindful of the suggestions to the contrary implicit in respondent's position, we simply can see no other reason why petitioners would have engaged in the activity and incurred the resulting expenses unless for profit. Taking into account the applicable factors as a whole and considering the totality of the circumstances in this case, we conclude that petitioners operated their horse racing activity for profit during 1994. That being so, we find that petitioners' horse racing activity constituted a trade or business during that year and they are entitled, under section 162(a) to some, but not all of the deductions here in dispute.

Deductions are a matter of legislative grace. A taxpayer who claims a deduction must establish that all requirements of the statute that allows the deduction have been satisfied. See New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

To be deductible as a trade or business expenses under section 162(a), the expense must be ordinary and necessary. See Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Deputy v. du Pont, 308 U.S. 488, 495 (1940). Both petitioners testified at trial. Petitioners' return preparer was present at trial and was allowed to sit at counsel table to assist petitioners in the presentation of their case; she was not called as a witness. Although questioned on the points, petitioners failed to establish that the following deductions were ordinary and necessary to the operation of their horse racing activity: Custom hire--$1,600; insurance--$817.92; interest (other)--$1,494.67; repairs--$2,274.82; and taxes--$1,892. Consequently, petitioners are not entitled to deductions for those items.

Petitioners' horse racing activity was conducted at their farm, which was also their residence. Deductions attributable to the use of a taxpayer's residence in the taxpayer's trade or business are limited by the amount of gross income derived from such use. See sec. 280A(c)(5). As best as can be determined from the record, the mortgage interest deduction of $1,665.96 claimed on the Schedule F relates to the mortgage on petitioners' residence. Some or all of the amount might be allowable as an itemized deduction. See section 163. (Petitioners did not elect to itemize deductions on their 1994 return.) Nevertheless, because of the amount of gross income earned by petitioners in

their horse racing activity, mortgage interest is not allowable as a trade or business deduction on the Schedule F.

In general no deduction is allowed for "any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property." Sec. 263. During 1994, petitioners constructed a new barn, or substantially improved an existing one. Amounts expended for the construction or improvement of the barn were deducted as "supplies" on the Schedule F. Petitioners are not entitled to deduct the construction costs. Instead, the costs must be capitalized and included in the basis of the barn. See sec. 1012; sec. 1.162-12(a), Income Tax Regs.

Cost incurred to raise livestock may be deducted or capitalized at the option of the taxpayer. See sec. 1.162-12(a), Income Tax Regs. In contrast, under the applicable version of the controlling regulation, the cost of acquiring, as opposed to raising, a sporting animal, such as a race horse, is considered an investment in capital. A breeding fee, or stud fee, is classified as either a cost of "raising" or a cost of "acquiring" an animal depending upon which party bears the risk of loss that the breeding process is unsuccessful. Duggar v. Commissioner, 71 T.C. 147 (1978); Ellis v. Commissioner, T.C. Memo. 1984-50.

In this case, petitioners were guaranteed a live foal in the stallion service contract involving Hilarious Astro, and it appears that a similar guaranty was in effect in the contract

involving Jordan's Tan.  That being so, the breeding fees deducted on the Schedule F must, instead, be capitalized.  See <u>Duggar v. Commissioner</u>, <u>supra</u>.

Petitioners are entitled to the deductions claimed on the Schedule F that have not been specifically addressed in the discussion portion of this opinion.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.