ROBERT V. AND BETTY J. ELLIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ellis v. Commissioner
Docket No. 9666-80.
United States Tax Court
T.C. Memo 1984-50; 1984 Tax Ct. Memo LEXIS 619; 47 T.C.M. (CCH) 991; T.C.M. (RIA) 84050; January 31, 1984. George S. Bennett and John T. Kay, Jr., for the petitioners. Robert J. Kastl, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency of $2,883.59 in petitioners' Federal income tax for the taxable year 1977. The issues for our decision are: 1. Whether petitioners' operation of Round Top, a "horse farm," constitutes "an activity not engaged in for profit" within the meaning of section 183; *621 [1] and 2. If Round Top is found to be an activity engaged in for profit, whether certain expenses paid in connection with the breeding of petitioners' mare in 1976 were properly capitalized as the basis of the resultant foal and deductible upon the foal's death in 1977, or whether such expenses should have been currently deducted in the year paid, 1976, and were therefore not properly deductible in 1977. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, as orally amended at trial, and exhibits attached thereto are incorporated herein by this reference. Petitioners Robert V. Ellis (Mr. Ellis) and Betty J. Ellis (Mrs. Ellis), husband and wife, resided in Winfield, West Virginia, at the time they filed the petition in this case. They filed a joint Federal income tax return for the taxable year 1977 with the Internal Revenue Service Center in Memphis, tennessee. Petitioners reported their income on the cash receipts and disbursements method of accounting. Mr. Ellis purchased *622 his first horse in 1962 at the suggestion of Mr. T. P. Phillips, Jr. (Mr. Phillips), a business associate. Between 1962 and 1969, Mr. Ellis owned several horses that he used primarily for pleasure riding. During this period of 1962-1969, Mr. Ellis became increasingly familiar with horses and their care and feeding. He annually attended the All American Quarter Horse Congress, beginning with the first such Congress in 1966. The All American Quarter Horse Congress is a multi-day equine exposition held in Columbus, Ohio each year. During the Congress, demonstrations and lectures on various facets of the quarter horse industry are presented. Various horse races and shows as well as recreational events are also held during the Congress. Mr. Phillips accompanied Mr. Ellis to some of the Congresses. In 1969 Mr. Ellis helped found the West Virginia Quarter Horse Association and was elected as its first president. By the end of 1969, Mr. Ellis felt that he had the knowledge and experience to engage in the raising of quarter horses as a business. At no time prior to 1969 did petitioners in computing their income taxes deduct the expenses of maintaining any of their horses. In *623 June of 1969, Mr. Ellis purchased a quarter horse named Billy Music. Billy Music was trained and shown during the summer and fall of 1969 by a Mr. Alex Ross, a professional horse trainer. The horse was also ridden during this period by a Mr. Walter Hughes, who was also knowledgeable in the showing of quarter horses. Mr. Ellis hoped to make Billy Music into an American Quarter Horse Association (AQHA) champion. The horse was shown extensively in North Carolina, South Carolina, and Virginia to achieve this goal, the horse traveling some 10,000 miles during the summer of 1969. Billy Music became an AQHA champion and the "high point" quarter horse for North Carolina in 1969. At that time monetary prizes were not awarded for the showing of quarter horses. Instead, the horses were awarded "points." The more points a quarter horse earned, the more valuable that horse became, as measured by the stud fee that could be demanded and the price for which the horse could be sold. It was through the collection of stud fees and sales that a quarter horse used for show generated income, not from the actual showing of the horse itself. In 1969, Mr. Ellis and Mr. Phillips formed a partnership *624 (the partnership) to raise and show quarter horses. Partnership returns, Forms 1965, were filed with respect to the activity. The record does not indicate whether respondent contends that the partnership was an activity not engaged in for profit. [2]
In December of 1969, Mr. Ellis and his former wife (Sara), together with Mr. Phillips and his wife, purchased approximately 100 acres of land, located on Route 34 in Putnam County, West Virginia (Route 34 land) for $30,100 or $300 per acre. Each couple took a one-half undivided fee simple interest in the Route 34 land, respectively, as joint tenants with right of survivorship. The property was purchased for use in the partnership's quarter horse venture. Mr. Phillips, a realtor, had developed property in the past, and both he and Mr. Ellis were generally familiar with the area in which the Route 34 land was located. They both believed that the Route 34 land would meet the needs of their quarter horse venture and would also appreciate in value. The *625 acreage that ultimately became petitioners' separate property, known as "Round Top," was a part of the Route 34 land. By the time of the trial that land had appreciated substantially and was worth from $5,000 to $10,000 an acre. When purchased, the Route 34 land was in an overgrown and unimproved condition. Mr. Ellis and Mr. Phillips personally did most of the work to clear and improve the land. They built a barn on one side of the property for use in their horse venture. They also built a fense along the perimeter of the property. In 1971, Mr. Phillips built his personal residence on a portion of the Route 34 land. Appropriate survivorship transfers were made to allow a construction mortgage on Mr. Phillips' land and home. Mr. Phillips purposely located his residence near the barn so that he could guard the barn area against fire, theft, and the like. In 1973, Mr. Ellis built his current personal residence on a separate portion of the Route 34 land. He was divorced from his former wife in that year and their former residence in South Hills was sold in order to give effect to a property settlement incident to their divorce. On May 29, 1973, Mr. Ellis' former wife, pursuant *626 to said property settlement, deeded all of her interest in the Route 34 land to Mr. Ellis. Mr. Ellis and Mr. Phillips conducted their quarter horse partnership until the end of 1974, when they agreed to dissolve it due to Mr. Phillips' health problems. As part of the dissolution, they partitioned the Route 34 land, with each receiving approximately 50 acres, including their respective personal residences. Petitioners' 50 acres consists of two tracts, approximately 20 acres and 30 acres, respectively, divided by Route 34, a public highway that crosses the property.Petitioners' residence and the facilities they subsequently built for use in their horse operations are located on the 30 acre tract, known as Round Top. After dissolution of the partnership, petitioners decided to continue their quarter horse breeding and showing activities as a sole proprietorship. Since the 50 acres of the Route 34 land they received did not contain the original facilities used by the partnership for the raising and showing of quarter horses, petitioners had to construct their own barn, equipment shed, fences, paddocks, riding and training ring, and other related facilities. The barn petitioners *627 built had several special features. It was basically a rectangular building, 70 feet long by 40 feet wide. The center area of the structure contained six stalls for the horses. A partition that separated two stalls could be removed so that two separate stalls could be combined and used as one larger "foaling stall" when a mare was giving birth to a foal. The portion of the structure between the outer edge of the stalls and the inside edge of the outer-wall formed an open area, which may best be described as an "indoor riding track." This "track" could be used to exercise and train the horses, especially when inclement weather or darkness prevented such activities from being conducted outdoors. The barn had electrical connections, lights, and running water. Petitioners' barn and other facilities were quite adequate and efficient for their quarter horse operations. Upon dissolution of the partnership, petitioners received a mare, Handful's Beauty, and two studs, Joe's Handful, and Pepo. They also had Billy Music, the gelding Mr. Ellis had purchased in 1969. Prior to its dissolution, the partnership had only the one broodmare, Handful's Beauty. Both Joe's Handful and Pepo were *628 foals of Handful's Beauty, born in 1973 and 1974, respectively. The sire of Joe's Handful was Joe Blair, a quarter horse race horse with fine bloodlines. Pepo's sire was Brio, a very distinguished quarter horse with a very good bloodline who had sired several outstanding offspring. Petitioners always tried to obtain the finest stud horses available to sire their quarter horses.All of petitioners' horses were registered with the AQHA. Handful's Beauty was with foal at the time of the partnership dissolution, and a third foal, Star of Brio, was born to her in 1975. Star of Brio had the same sire as Pepo and was registered with the AQHA. Star of Brio was the "high point" quarter horse on the East Coast at sometime, but the record does not indicate the precise year. Shortly after petitioners began operating Round Top as a sole proprietorship in 1975, they were presented with an opportunity to expand the scope of their activities. Some previous associates of Mr. Ellis who were involved in thoroughbred horse racing contacted him from Versailles, Kentucky, and proposed a joint venture under which petitioners would provide the horse and the Kentucky assciates would train the horse *629 for racing. The revenues generated by a successful quarter horse race horse were generally both greater in amount and of a more immediate nature than those generated by showing quarter horses. [3] Petitioners accepted this offer and took Joe's Handful from Round Top to the Kentucky Training Center in Lexington, Kentucky, for professional training. Joe's Handful responded to this training so well and his prospects as a race horse were so promising that petitioners entered him in a futurity race at the upcoming All American Quarter Horse Congress and paid the nomination fees associated with his entry. Petitioners originally had hoped to hold Joe's Handful out for stud, and winning or making a good showing in one of the races held at the Congress would have increased the demand for and the value of the horse's services as a stud. *630 Unfortunately, after approximately two months of training, Joe's Handful became sore in the front legs. Petitioners consulted a veterinarian who advised them to take Joe's Handful out of training and let him rest for a while, which they did. The veterinarian thought that Joe's Handful was perhaps too "feisty" and should be gelded. Acting on the verterinarian's advice, petitioners decided to have Joe's Handful gelded. However, during that operation, Joe's Handful suffered a heart attack and died. The death of Joe's Handful was reported to the AQHA on April 15, 1975, and with his death petitioners' venture into racing ended for the time being. The other aspects of petitioners' activities were also subsequently beset by unforeseeable and unfortunate mishaps. In 1975, petitioners' attempts to breed Handful's Beauty, their sole broodmare, to a stallion of very good lineage, named Replate, proved unsuccessful. The gestation period for horses is 11 months, and a broodmare can only deliver one foal per year. In 1976 petitioners again attempted to breed Handful's Beauty, this time to Brio, the same stallion that had sired Pepo and Star of Brio. This attempt was successful. Brio *631 was then the top stud horse on the East Coast, and petitioners were eager to have a filly by Brio. However, Handful's Beauty encountered serious problems in delivering the foal, a filly. In the spring of 1977, both Handful's Beauty and the filly died during foaling. Generally, serious problems with delivery of a foal rarely occur, but when they do, both the mare and the foal usually die, absent the presence of someone to assist in the delivery. In this case, Mr. Ellis, his wife, and a veterinarian were present, but were unable to save either the mare or the foal. With the death of Handful's Beauty, petitioners were left without a broodmare. In 1977 Star of Brio was gelded and Pepo was sold for $3,000, which was reported on petitioners' tax return for the year. In July of 1978, petitioners purchased another broodmare named Joleo Pac Bailey, who was with foal at the time of purchase. Joleo Pac Bailey successfully delivered this foal on January 2, 1979. Petitioners named the foal, a stallion, Rocket Pac Bailey. Joleo Pac Bailey was again bred in 1979, this time to the stallion, Replate, the thoroughbred who had received monetary prizes in nine racing starts. Joleo Pac Bailey *632 successfully delivered this foal on April 3, 1980. Petitioners named this foal, also a stallion, Gallant Will. Both Rocket Pac Bailey and Gallant Will were sired by race horses. Petitioners desired foals sired by race horses in order to expand their operations to include racing their horses as well as showing them. Mr. Ellis believed that the shortage and expense of gasoline at that time threatened their ability to continue to show horses, because of the extensive travel involved. However, he believed the racing end of the quarter horse industry would survive. He thus wanted to breed their mare to race horses in hopes of expanding their operations to include racing. However, for reasons not wholly explained, petitioners sold both Rocket Pac Bailey and Gallant Will at an auction in 1980. Mr. Ellis testified that he sold the horses "… mainly because I knew I had this tax case coming up, and I was wanting to see what they would bring." Although Mr. Ellis expected the horses to bring "big prices," the market for quarter horses was quite low during this time period, and petitioners made only $1,659 from the sale of both horses. Petitioners reported the receipts from the sale *633 of Racket Pac Bailey and Gallant Will on their 1980 Federal income tax return. Had those two horses sold in the same price range as Pepo, as petitioners had expected, Round Top would have had a profitable year in 1980. Joleo Pac Bailey was again bred in 1980, but in April of 1981, both she and the foal died during delivery. Thus, between the beginning of 1975 when petitioners began operating their horse venture as a sole proprietorship and April 1981, petitioners lost five of the ten horses (including the foals that died at birth) they owned, including the loss of both their broodmares. During this period of time, petitioners continued to show those horses not used in the breeding aspect of Round Top's operations. Petitioners personally showed their horses through 1978, and their horse, Billy Music, was shown by others through 1979. Although Billy Music was a gelding who could not be used in the breeding operations, showing him served to advertise the fine bloodlines petitioners were striving to develop at Round Top. Petitioners generally showed their horses in weekend horse shows. The preparation for a weekend horse show began much in advance of the particular weekend *634 the show was to be held, and required grooming and working the horse every evening. Many if not most of the shows required petitioners to travel both to and from other cities in which the shows were located. Normally, petitioners would prepare the horses for travel and leave for the show on Friday afternoon. Upon arrival at a horse show, the horses had to be stabled for the evening. Most of the weekend shows in which petitioners entered their horses were two day shows (Saturday and Sunday). The horses were generally shown in two different classes--performance and halter classes. In the performance classes, a professional rider actually rode the horses for an extended period of time. In the halter classes, the person showing the horse remained on the ground, leading the horse by its halter. Petitioners usually tried to show their horses in both classes, although the same horse would not necessarily be shown in both classes. Either Mr. Ellis or Mrs. Ellis personally showed their horses that were entered in the halter class. However, petitioners' horses that were entered in the performance classes were trained and ridden by various other people during this time. Because of *635 previous injuries to his knees, Mr. Ellis was unable to ride a horse for periods in excess of 15 to 20 minutes without considerable physical discomfort. Thus, Mr. Ellis was physically unable personally to show the horses in the performance classes, even assuming he had the desire and requisite skills to do so. On a typical show day, Mr. Ellis would get up at 5:30 a.m. and go out to the show grounds to feed, bathe, groom and sometimes exercise the horses. The actual showing of the horses would start around 9:00 a.m., with the halter classes lasting until approximately noon. The performance classes would then be held in the afternoon. The combined showing activities took up most of the day. After the showing activities had concluded for the day, the horses again had to be fed, which Mr. Ellis usually did at about 5 or 6 p.m. Mr. Ellis would again exercise and groom the horses and clean out their stalls. With a typical two day show, the second day's activities would be essentially the same. After the show was over, usually on a Sunday afternoon, petitioners transported their horses back to Round Top. When they arrived at Round Top, all of the equipment had to be put away, and *636 the horses also had to be unloaded and put away. Mr. Ellis aptly described a typical weekend horse show as "two and a half days and it's all work." Except for minimal riding required to train the horses, they were ridden very little. As noted above, Mr. Ellis was unable to ride a horse for longer than 15 to 20 minutes at a time without suffering considerable physical discomfort. Except for the training ring and horse shows, the horses were only ridden about once a month, when Mr. Ellis would ride them over his property to check the fences. Although petitioners have three daughters, none of them showed any interest whatsoever in horses. At the time petitioners showed their horses, monetary prizes were not awarded in their area for showing quarter horses. Instead, "points" were awarded. Accordingly, all income that petitioners derived from showing quarter horses was generated by sales and breeding fees obtained on "high point" quarter horses. During the periods relevant to this case, petitioners reported income from the sale of show horses and the rental of stalls and other income items. When petitioners were not showing their horses, there was still much work to be done *637 in connection with the day-to-day operation of Round Top. Mr. Ellis had to feed the horses every morning and again every evening, and he personally performed these chores on a day-to-day basis. He would get up every morning at 6:30 a.m. and go to the barn to feed and water the horses and briefly examine them to see if he could spot any obvious problems. The morning routine usually took approximately 45 minutes to one hour to complete. In the evening when Mr. Ellis returned from his accounting practice, he would go back to the barn and again feed and water the horses. The evening feeding required approximately the same length of time as the morning feeding. After feeding the horses and eating his own dinner, Mr. Ellis would then go back to the barn and spend considerable amounts of time training and exercising the horses. Due to the special construction of petitioners' barn facilities, Mr. Ellis was able to train and exercise the horses on winter as well as summer evenings. Although Mr. Ellis worked each horse only 15 to 20 minutes per day, after such exercise the horses had to be cooled off and cleaned up before they could be put back in their stalls for the night. In the winter *638 months an even greater amount of time had to be spent cooling the horses off after exercising then to prevent their catching pneumonia. Mr. Ellis dedicated several hours each day to the training and care of the horses, not including the time he spent actually showing the horses on those weekends they were entered in horse shows. In an average week he spent 30 to 35 hours engaged in the care and training of his horses, about the same time that he devoted to his accounting practice. During all the years since the partnership was dissolved and while Round Top has been operated as a sole proprietorship, Mr. Ellis has continued his practice of attending the All American Quarter Horse Congress. During those years, Mr. Ellis also traveled extensively out west, to Wyoming, Colorado, North Dakota, Arizona, New Mexico, Texas, Kansas, and Oklahoma, where he visited the large quarter horse ranches and talked with large-scale operators in the quarter horse business. One purpose for these trips was to view the breeding operations and horses that were for sale in other parts of the country, but most, if not all, of these trips were also vacations. Petitioners never attempted to deduct the *639 expenses incurred on such trips as expenses of their quarter horse operation. During this period, Mr. Ellis has also read professional publications on a regular basis. In particular, he studied the Quarter Horse Journal, the monthly publication of the AQHA, which is regarded as the "Bible" of the quarter horse industry. The start-up time required before a new horse venture such as Round Top could be expected to show a profit where there are no show horses currently of are is usually quite lengthy, spanning several years. Generally, it takes four years from the time a foal is born until the horse is considered a finished show product. If facilities such as a barn and the like have to be built, as in this case, the start-up period will be even longer. The average number of horses owned by a typical West Virginian engaged in the business of breeding, raising, and showing quarter horses ranged from four to six horses per owner, about the size of petitioners' typical herd. It would be possible to make money with an operation like that of petitioners under the proper management and with good luck. However, if an operation the size of Round Top lost three horses, it would be *640 very difficult for it to make money. In this case, petitioners lost three horses and two foals over the seven-year period from 1975 to 1981, inclusive, with three of these being lost in the three-year period from 1975 to 1977. Petitioners reported the following items of income with respect to Round Top for the taxable years 1975 through 1980: Stall
Patronage
Year
Sales
Rent
Dividend
Other
Total
1975
$32.51
$37.50
$70.01
1976
None
1977
$3,000.00
$600.00
24.22
11.58
3,635.80
1978
1,300.00
32.34
12.94
1,345.28
1979
None
1980
1,659.00
1,659.00
In the same period petitioners have claimed the following net losses from their quarter horse operation: Taxable Year
Amount
1975
($4,146.76)
1976
($6,029.69)
1977
($5,812.00)
1978
($2,144.95)
1979
($4,289.06)
1980
($2,312.92)
Petitioners maintained a separate bank account and records for Round Top. The $3,000 sale reported by petitioners on their 1977 joint return was from the sale of Pepo in that year. On the Schedule F filed with their 1977 return, petitioners also claimed a basis in Pepo of $405.82, which was the basis *641 that had been carried over from the partnership on its dissolution, since Pepo had been a "partnership horse." The partnership used the cash receipts and disbursements method of accounting, but in preparing the partnership's tax returns, Mr. Ellis decided to capitalize rather than expense the breeding fees, thereby creating a "basis" in the partnership horses. Thus, Mr. Ellis capitalized the breeding fees associated with Pepo, carrying such amount on the partnership's books as the partnership's basis in Pepo. In doing so, Mr. Ellis thought he was "… resolving the question in favor of the Government." It was the basis derived in this manner that petitioners subsequently treated as carried over from the partnership and reported on their 1977 joint Federal income tax return. While respondent has not challenged this treatment in regard to the sale of Pepo, respondent has raised a question in regard to the foal which died in 1977. On the Schedule F attached to their 1977 joint return, petitioners reported a net farm loss from Round Top in the amount of $5,812.20. The Schedule F showed gross profits from Round Top in 1977 in the amount of $3,229.98. The Schedule F also reported *642 total deductions from Round Top for 1977 in the amount of $9,042.18. Of the total deductions claimed, the Schedule F listed an amount of $1,010 as a deduction for the "Cost of fillie (sic) died at birth." That was the foal of Handful's Beauth that died at birth in 1977. [4] The $1,010 amount represented petitioners' claimed basis in such filly, computed in the same manner as in the case of Pepo. The breeding fees and other expenses associated with breeding the mare were treated as the cost of the foal to be subsequently born, and were capitalized and carried as the basis of that foal when born, rather than currently expensed when actually paid. However, this total "basis" of $1,010 included not only the breeding fee itself ($510), but also the boarding fee and any other miscellaneous expense, such as feed for the mare, associated with the breeding of Handful's Beauty with respect to this particular foal. *643 Over the years, Mr. Ellis had been involved in various other business activities, including the hotel business, the development of a zoo, the development of a campground business, a finance company, buying and selling real estate as an investor in a partnership arrangement, and finally a coal mining venture. Mr. Ellis was actively involved in the management and decision-making processes of many of these activities, and the only one of these projects in which he had ever lost any money was the coal mining venture. Besides the operation of Round Top, Mr. Ellis is and has been involved in many other activities. Mr. Ellis, a certified public accountant, is the managing partner of the accounting firm of Ellis and Ellis. The firm was started by Mr. Ellis and his brother in 1946, and Mr. Ellis' brother and three of his brother's sons are the other partners in the firm. At the time of trial, the accounting firm included about 22 people. Mr. Ellis currently devotes an average of 35 hours per week to his accounting practice. For taxable year 1977, petitioners reported gross income of $115,012.69 as Mr. Ellis' distributive share of the accounting firm's income. Mr. Ellis was 55 years *644 old at the time of trial and had no retirement plan. He hoped one day to sell out his interest in the accounting firm to his three nephews and devote his full time and energy to Round Top to supplement his income. By a notice of deficiency dated March 14, 1980, respondent disallowed in full the claimed loss deduction of $5,812.20, asserting that Round Top was an activity not engaged in for profit. At trial, respondent raised the additional issue that if Round Top was found to be an activity engaged in for profit, then petitioners were not entitled to deduct the $1,010 claimed as the basis of the foal that died at birth in 1977. Instead, respondent asserted such expenses should have been currently deducted when paid in 1976, rather than capitalized as the basis of the unborn foal. OPINION The first issue we must decide is whether petitioners' operation of Round Top constituted an "activity not engaged in for profit" within the meaning of section 183. Respondent has determined that Round Top was not engaged in for profit. Petitioners bear the burden of proving respondent's determination erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax *645 Court Rules of Practice and Procedure.
Section 183 provides the general rule that if an individual's activity is not engaged in for profit, "no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(a). An activity not engaged in for profit is defined in section 183 as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The standard for determining whether the expenses of an activity are deductible under either section 162 or section 212(1) or (2) is whether the taxpayer engaged in the activity "with the actual and honest objective of making a profit." Dreicer v.Commissioner,78 T.C. 642, 645 (1982), affd. in an unpublished opinion, 702 F. 2d 1205 (D.C. Cir. 1983); Allen v. Commissioner,72 T.C. 28 (1979); Dunn v. Commissioner,70 T.C. 715 (1978), affd. 615 F. 2d 578 (2d Cir. 1980). The taxpayer's expectation of profit need *646 not be a reasonable one but there must be a good faith objective of making a profit. Section 1.183-2(a), Income Tax Regs; Dreicer v. Commissioner,supra;Allen v. Commissioner,supra,72 T.C. at 33. Whether petitioners had the requisite profit objective is a question of fact to be determined from all the facts and circumstances. Section 1.183-2(a), Income Tax Regs; Dreicer v. Commissioner,supra;Dunn v. Commissioner,supra,70 T.C. at 720; Golanty v. Commissioner,72 T.C. 411 (1979), affd. in an unpublished opinion, 647 F. 2d 170 (9th Cir. 1981). In resolving this factual question, greater weight is given to objective facts than to the taxpayer's mere statement of intent. Section 1.183-2(a), Income Tax Regs; Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The regulations contain a list of relevant factors for consideration in determining whether an activity is engaged *647 in for profit. These relevant factors are (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs. These factors are, in large part, a synthesis of prior case law, but no one factor is determinative. Benz v. Commissioner,63 T.C. 375, 382-383 (1974). To begin with, it is clear that the activity of breeding, raising, and showing horses for sale may constitute a trade or business or an activity engaged in for profit. Commissioner v.Widener,33 F. 2d 833 (3d Cir. 1929), *648 affg. 8 B.T.A. 651 (1927); Wilson v. Eisner,282 F. 38 (2d Cir. 1922). We believe that the record considered as a whole reveals that petitioners' activities with respect to Round Top were engaged in with the objective of making a profit. Our conclusion is based upon all the facts and circumstances, although we have based many of our findings largely upon the uncontradicted testimony of Mr. Ellis. We found him to be very credible and worthy of belief. Petitioners carried on their activity in a businesslike manner. Section 1.183-2(b)(1), Income Tax Regs., provides that: The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit. Similarly, where an activity is carried on in a manner substantially similar to other activities of the same nature which are profitable, a profit motive may be indicated. A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive. Mr. *649 Ellis maintained a separate bank account for Round Top, assuring that Round Top's financial records were separated from petitioners' personal expenses. Further, Round Top was operated in a manner substantially similar to other activities of the same nature which were profitable. Round Top was of an average size for a business of this nature in West Virginia, and its facilities were adequate, even above average. Our conclusions on this point are based upon the persuasive testimony of petitioners' expert witness, Mr. Fleshman. Not only were we impressed with Mr. Fleshman's qualifications as an expert witness, but his testimony with regard to petitioners' operation of Round Top was uncontradicted by respondent. Moreover, Mr. Fleshman was not acquainted with petitioners, and he formulated his opinion from the stipulation of facts and the testimony adduced at trial. Thus, his opinion, like our conclusion herein, is based upon the objective evidence in the record. Furthermore, petitioners were on the lookout for new techniques and methods that might improve the profitability of Round Top. They readily took advantage of an opportunity to place one of their horses in professional *650 race training at practically no additional cost, which, if successful, would have generated greater and more immediate profits. Petitioners merely supplied the horse while their Kentucky associates provided the training. Joe's Handful was responding very well to his training as a race horse, so well that petitioners had entered him in one of the futurity sweepstakes at an upcoming All American Quarter Horse Congress. Unfortunately, his unforeseen and accidental demise destroyed any chance of profiting from racing Joe's Handful. Likewise, petitioners' attempts during and after 1977 to once again expand their activities to include racing their horses also evidence an actual and honest profit objective. Due to the expense and shortage of gasoline that Mr. Ellis felt threatened their ability to make a profit from showing horses, they tried to shift the focus of their activities to racing, which they did not believe to be as imperiled by the gasoline crunch. When petitioners purchased Joleo Pac Bailey in 1978 as a replacement for Handful's Beauty, who had died while foaling in 1977, Joleo Pac Bailey was already with foal, having been bred to a race horse.In 1979, petitioners again *651 bred Joleo Pac Bailey to another race horse. Petitioners' efforts to modify their activities to meet perceived economic changes strongly indicate that Round Top was operated in a businesslike manner. We are unpersuaded by respondent's arguments to the contrary. [5]
Respondent also argues that it was physically impossible for petitioners to be in the business of breeding and raising quarter horses because during most of 1977 petitioners' only two horses were geldings. This argument totally overlooks the unexpected death of petitioners' mare while foaling in the spring of 1977. *652 Nor does the failure to replace Handful's Beauty with the new Mare, Joleo Pac Bailey, for over one year indicate a lack of profit motive. Petitioners were very concerned about maintaining as high a quality of bloodline as possible. One would not expect them to purchase the very first mare that was available. Moreover, at the time of purchase, Joleo Pac Bailey was already with foal and thus made up for any time lost in the search for a suitable mare and sire. Petitioners were purposely seeking a replacement mare with Joleo Pac Bailey's characteristics. Rather than indicating a lack of profit objective, the time and care petitioners exercised in the selection and purchase of a suitable replacement broodmare demonstrate the businesslike manner with which they operated Round Top. Respondent also argues that the retention of Billy Music and Star of Brio indicates a failure to operate Round Top in a businesslike manner, asserting that since both horses were geldings, petitioners could generate revenues from these horses only by selling them. However, respondent overlooks that both Billy Music and Star of Brio had achieved great success as show horses, and as such were of considerable *653 value to petitioners as advertisement of the quality of their horses. In light of the generally poor market conditions for the sale of quarter horses during much of the period, we feel that petitioners' retention of Billy Music and Star of Brio was amply justified. Respondent also points to the unexplained sale of Pepo in 1977 as indicating that petitioners failed to carry on their activities in a businesslike manner. Pepo was sold when he was three years old, prior to becoming a "finished" show product. The value of a show horse is enhanced by being shown and earning show points. Respondent argues that if petitioners truly had a profit objective, they would not have sold Pepo prior to the age at which he purportedly would have reached his maximum value. Although somewhat probative, this factor does not outweigh those discussed above showing petitioners' businesslike manner of conducting their opration. The sale of Pepo is not fully explained, but the sales price apparently was good for that time, and there may well have been other business reasons for the sale at that time. Respondent also points to petitioners' failure to deduct certain expenses as indicating petitioners' *654 belief they were not engaged in a business. In particular, respondent points to expenses incurred by petitioners on Mr. Ellis' annual trips to the All American Quarter Horse Congress and their trips out west to view the operations of the large quarter horse ranches. Respondent contends that Mr. Ellis, as a certified public accountant, surely was aware that such expenses were deductible if incurred in connection with the operation of a trade or busines. The trips petitioners took had vacation aspects that colored the deductibility of such expenses and had they been deducted, the Court would no doubt be faced with another dispute in this case. Mr. Ellis took conservative positions in filing tax returns, such as capitalizing breeding fees and not claiming all expenses that arguably could be deemed to be business expenses. We will not find that a profit objective was absent under these circumstances. In addition to the businesslike manner in which petitioners operated Round Top, other relevant factors also indicate that petitioners had an actual and honest profit objective. Although Mr. Ellis' initial contacts with horses had been merely for pleasure, by the time petitioners began *655 operating Round Top as a sole proprietorship in 1975 he had acquired considerable experience with quarter horses. Mr. Ellis had annually attended the All American Quarter Horse Congress since its inception in 1966. Mr. Ellis helped found the West Virginia Quarter Horse Association in 1969 and served as its first president. He read extensively in the American Quarter Horse Journal. On vacations, he often traveled out west to view the large ranches and their large-scale operations. Finally, from 1969 to 1974, Mr. Ellis had previously been involved with the breeding, raising, and showing of quarter horses in connection with the partnership with Mr. Phillips. Thus, we are satisfied that Mr. Ellis possessed a considerable degree of experience and expertise on the subject of quarter horses. Petitioners also used professionals in connection with Round Top. Billy Music was trained and shown by a professional horse trainer. Joe's Handful was given race training by professionals in that business. Also, petitioners' horses that were shown in the performance classes were trained and ridden by skilled horsemen. The expertise of petitioners and their advisors also strongly indicates an *656 actual and honest profit objective. We are also influenced by the substantial amount of time and effort petitioners expended in operating Round Top. Mr. Ellis spent several hours daily in performing the day-to-day work associcated with Round Top. Moreover, entering horse shows involved additional time and work, both in preparing for the shows and at the shows themselves. Each show involved two and a half days, which were "all work." Although Mr. Ellis did employ some outside help, he performed most of the work associated with Round Top himself. This substantial investment by Mr. Ellis of time and labor in petitioners' horse activities is persuasive evidence of an actual and honest profit objective. Section 1.183-2(b)(3), Income Tax Regs.
Petitioners' expectation that assets used in connection with Round Top might appreciate in value lends further support to our conclusion herein that Round Top was operated for profit. Section 1.183-2(b)(4), Income Tax Regs. It is clear that when a quarter horse is successfully shown, the value of that horse increases. Due to their previous success in showing their horses and the high *657 quality of the horses' bloodlines, petitioners had every reason to expect their horses would appreciate in value. Moreover, the land used in connection with Round Top has substantially appreciated in value since its purchase. This land had been carefully selected by Mr. Ellis and Mr. Phillips for use in their horse breeding and raising activities, not with the primary intent to profit from an increase in the value of the land. [6] Any holding of the land for appreciation was secondary to the central purpose of using the land as the base for their quarter horse activities. See Engdahl v. Commissioner,supra,72 T.C. at 668-669. [7] Thus, the Round Top land was an asset used in petitioners' horse activities and their expectation that the asset would appreciate in value further supports their claim that Round Top was an activity engaged in for profit. Section 1.183-2(b)(4), Income Tax Regs.
*658 Before Round Top, Mr. Ellis had been actively involved in many other business ventures, and he lost money in only one project. Mr. Ellis is the managing partner of his very successful accounting firm.Mr. Ellis' success in carrying on other business activities supports petitioners' argument that Round Top was engaged in for profit. Section 1.183-2(b)(5), Income Tax Regs.
Finally, we do not believe that the operation of Round Top involved substantial elements of personal pleasure or recreation. Due to previous physical injuries, Mr. Ellis was unable to ride the horses for more than 15 to 20 minutes without suffering considerable physical discomfort. Petitioners' three daughters expressed no interest in the horses whatsoever.It does not appear that Mrs. Ellis rode the horses for pleasure either. That petitioners may have derived some pleasure or recreation from the operation of Round Top and showing of the horses is not enough to prevent Round Top from being treated as an activity engeged in for profit: It is not, however, necessary that an activity be engaged *659 in with the exclusive intention of deriving a profit or with the intention of maximizing profits… Also, the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is in fact engaged in for profit as evidenced by other factors…. Section 1.183-2(b)(9), Income Tax Regs. The other factors present that indicate a profit objective clearly outweigh any element of personal pleasure petitioners may derive from their operation of Round Top. We realize that there are some factors present here that have been considered as indicating an activity is not engaged in for profit. Petitioners sustained a loss in each and every year since beginning to operate Round Top as a sole proprietorship in 1975. See section 1.183-2(b)(6), Income Tax Regs. However, we feel that the presence of a loss in each year of operation is understandable in this case. Not only was Round Top still in the start-up phase of its operation, a period in which it is normal for a fledgling business activity to experience losses, but petitioners *660 repeatedly suffered unforeseen accidents. Between 1975 and 1977, petitioners lost three of their horses, and lost two more horses before the end of 1981. It would have been possible for petitioners to make money from Round Top with proper management and good luck. Petitioners had uniformly bad luck. With the death of three of their horses in such a short period of time, combined with the relatively poor economic conditions surrounding the quarter horse industry during this period, it was virtually impossible for petitioners to make a short-term profit from Round Top. The regulations recognize such a possibility: A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit…. If losses are sustained because of unforeseen or fortuitous circumstanceswhich are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in *661 for profit…. Section 1.183-2(b)(6), Income Tax Regs. (Emphasis added.) Thus, under the facts of this case, the fact that petitioners sustained a loss each year does not indicate that Round Top was not engaged in for profit. Mr. Ellis also had substantial income from sources other than Round Top. In 1977, Mr. Ellis reported in excess of $115,000 as his distributive share of income from the Ellis and Ellis accounting partnership. The fact that a taxpayer has substantial income from sources other than a particular activity may also indicate that such activity is not engaged in for profit, especially if losses from the activity are generating substantial tax benefits. See section 1.183-2(b)(8), Income Tax Regs. However, the concurrent existence of other income against which any deductions from the activity are usable merely poses the question, rather than answers it. In Engdahl v. Commissioner,supra,72 T.C. at 670, we stated: If there is no other income, there is no issue. As long as tax rates are less than 100 percent, there is no "benefit" in losing money… The essential question remains as *662 to whether there was a genuine hope of economic profit. We also noted in Engdahl that the petitioners therein had established their horse operation hoping to produce retirement income because they had to sizeable investments or substantial source of income other than Dr. Engdahl's orthodontic practice. 72 T.C. at 670. Mr. Ellis had no retirement plan and hoped to supplement his income after retirement by income generated from operation of Round Top. Thus, what we said in Engdahl holds equally true here. Round Top was operated with a "genuine" hope of economic profit," and the fact that Mr. Ellis had substantial income from other sources does not indicate a lack of profit objective. In summary, we conclude that Round Top was an activity engaged in for profit, but a combination of unforeseen mishaps prevented a profit from actually occurring. The restrictions of section 183 are therefore inapplicable to petitioners, and they are entitled to deduct their 1977 loss from Round Top. However, in so holding, we do not intend to give the petitioners a "blank check" for the indefinite future. While their unforeseen misfortunes persisted through 1981, nonetheless, *663 at some point, if the losses continue unabated, petitioners may be deemed to have abandoned any possible profit objective. Having concluded that Round Top was an activity engaged in for profit, we must now decide whether petitioners are entitled to deduct $1,010, the "basis" they claim in the foal that died at birth in 1977. Resolution of this issue turns upon whether the breeding fees and other miscellaneous expenses associated with the breeding of the mare in 1976 were properly capitalized as the basis of the unborn foal, as claimed by petitioners, or should have been currently deducted when paid in 1976, as asserted by respondent. There is no question that livestock raisers such as petitioners qualify as farmers for Federal income tax purposes.Petitioners herein elected to utilize the cash receipts and disbursements method of accounting to make their returns of income, rather than the optional inventory method available to farmers. See section 1.471-6(a), Income Tax Regs. Having elected the cash method, petitioners were not entitled to carry their horses as inventory. See DeHaven v. Commissioner,36 T.C. 935, 939 (1961). However, *664 failure to elect an inventory method does not necessarily preclude capitalization of the breeding fees by petitioners. Section 1.162-12(a), Income Tax Regs., relating to the expenses of farmers, provides in part that: A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. * * * The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay, * * *. (Emphasis added.) This language has been interpreted as allowing a cash basis farmer the option of expensing or capitalizing the costs of raising livestock. Duggar v. Commissioner,71 T.C. 147, 154 (1978); Welder v.United States,329 F. Supp. 739 (S.D. Tex. 1971), affd. 461 F. 2d 1269 (5th Cir. 1972). While such expenses may be currently deducted, there is no requirement that they must be. However, a later portion of section 1.162-12(a), Income Tax Regs. *665 , provides that "[a]mounts expended in purchasing work, breeding, dairy, or sporting animals are regarded as investments of capital, * * *." Such expenditures to purchase livestock are clearly capital in nature, must be capitalized, and are not subject to the election granted for costs connected with raising livestock. We think that the breeding fees incurred in connection with the filly that died at birth more closely resemble costs connected with raising livestock than with the purchase of such livestock. The record herein is devoid of any evidence that petitioners were ever guaranteed that a foal would result from the breeding attempts or that the breeding fee would be refunded if no pregnancy resulted, as would be the case if petitioners were purchasing a foal. The risk of loss was at all times upon petitioners. Thus, the transaction in question here can hardly be viewed as one involving the purchase of livestock. Cf. Duggar v. Commissioner,supra;Wiener v. Commissioner,58 T.C. 81 (1972), affd. 494 F. 2d 691 (9th Cir. 1974). Nevertheless, since the breeding fees may properly be viewed as a cost in connection with the *666 raising of the foal, we conclude that petitioners were free to either currently deduct the breeding fee or capitalize it as the basis of the foal. Upon the death of the foal, petitioners thus became entitled to a deduction under section 165(c)(1) or (2) equal to such basis, as petitioners received no compensation by way of insurance or otherwise. Section 165(a) and (b). As petitioners had not previously elected to currently deduct the breeding fee when paid, no double tax benefit results from such treatment. [8]
*667 However, we do not think the miscellaneous expenses of boarding and feeding the mare can properly be viewed in the same manner as the breeding fee, particularly since a loss deduction has been claimed and allowed for the mare. See footnote 4. The direct relationship which the breeding fee bears to the raising of petitioners' horses is not present with respect to the miscellaneous expenses. We think it would be improper to allow petitioners to capitalize these expenses as part of the basis of the resultant foal. Therefore, petitioners are not entitled to deduct these amounts upon such foal's death. Their basis in the foal consists of only the $510 paid in breeding fees, and their deduction for the loss of such foal is limited to that amount. Section 165(b). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue.↩
2. On brief respondent appears to assume the partnership operated at a loss and petitioners argue that the partnership made a profit. The record furnishes no evidence either way.↩
3. Although the rewards from racing are generally greater than those from showing, the chances of winning are slimmer. Income from showing quarter horses is generated solely by sales and breeding fees obtained from "high point" quarter horses. Income from racing quarter horses comes from prizes for winning races and from sales or stud fees after the horse's racing career is over.↩
4. Mr. Ellis also testified that $2,154.40 of the total deductions of $9,042.18 represented the book value of the mare (Handful's Beauty) that died in that year. The Schedule F does not report any separately stated loss for the death of Handful's Beauty but it is included as part of the $3,110.95 depreciation claimed for the year. Livestock acquired for work, breeding, or dairy purposes is depreciable, if it is not included in inventory. Although not labelled as a loss deduction, petitioners' computation of the amount appears to be correct and achieves the same result as a proper loss deduction. Sections 1.165-1(c)(1) and 1.165-6(d) (2), Income Tax Regs; Tenney v. Commissioner,42 B.T.A. 1049↩ (1940).
5. We do not believe that petitioners' sale of the foals resulting from breeding Joleo Pac Bailey to race horses, such sales occurring while the foals were still young, negates this conclusion. Mr. Ellis testified that he sold these horses "mainly because I knew I had this tax case coming up, and I was wanting to see what they would bring." Thus, petitioners may have felt pressured to show some profit in 1980, prompting petitioners to change their plans and sell. In any event, these sales in 1980 would not affect our conclusion as to petitioners' profit objective in the year before the Court, 1977.↩
6. Section 1.183-2(b)(4), Income Tax Regs., provides that: The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. See, however, paragraph (d) of § 1.183-1for definition of an activity in this connection. (Emphasis added.) The cited regulation, section 1.183-1(d)(1), Income Tax Regs., sometimes operates to prevent a taxpayer from including any appreciation in land as appreciation in an asset used in the activity in question. That regulation provides, in pertinent part, that: Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land). (Emphasis added.) However, since holding of the land was only a collateral purpose, and not the primary purpose, we do not feel that this regulation operates to prevent petitioners from considering the appreciation in the value of the land as appreciation in an asset used in connection with Round Top. We note, however, that when speaking here of the land used by petitioners in connection with Round Top, we are considering at most 30 of the actual 50 acres. The record indicates that 20 acres of the land was not used in connection with the quarter horse activities, and of the 30-acre parcel probably two acres around their personal residence should also be excluded from what we consider as Round Top. ↩
7. See also Fields v. Commissioner,T.C. Memo. 1981-550↩.
8. Section 1.165-6(d)(1), Income Tax Regs., provides as follows: (d) Loss of livestock--(1) Raised stock. A taxpayer engaged in the business of raising and selling livestock, such as cattle, sheep, or horses, may not deduct as a loss under section 165(a) the value of animals that perish from among those which were raised on the farm. However, that regulation contemplates the usual situation where the expenses of raising the livestock have already been deducted as ordinary expenses. See Bicha v. Commissioner,T.C. Memo. 1969-88. In other words, normally there can be no less deduction for loss of livestock raised by a cash basis taxpayer, because the expenses of raising the animal have already been currently deducted and the taxpayer has no basis in the animal. Section 1.165-6(d)(1), Income Tax Regs. That is not the situation here. See section 1.165-6(d)(2), Income Tax Regs.↩, relating to purchase stock.